(No. 32393.—

MIDLAND ELECTRIC COAL CORPORATION, Appellee, *vs.* THE COUNTY OF KNOX *et al.,* Appellants.

*Opinion filed September 24, 1953—Rehearing denied Nov. 16, 1953.*

BEN ROBINSON, State's Attorney, and BURREL BARASH, both of Galesburg, for appellants.

KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, and HARDY, HARDY & HARDY, both of Chicago, (JOSEPH B. FLEMING, and THOMAS M. THOMAS, of counsel,) for appellee.

MATHIAS, MELOY & MERKER, (WARREN A. HEINDL, of counsel,) both of Chicago, for Illinois Agricultural Association, *amicus curiae*.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This is an appeal from a final decree of the circuit court of Knox county wherein the circuit court decreed that a Knox County zoning resolution was unconstitutional and void insofar as it related to or prohibited the use of land for the recovery of coal by strip method of mining, and permanently enjoined the defendants from enforcing and carrying out the provisions of the zoning resolution in reference to such strip mining.

The constitutionality of a county zoning ordinance being involved the appeal properly comes here.

The basis of the trial court's holding, as stated in its written decree, was that the restrictions against strip mining in the zoning resolution generally and as applied to the plaintiff's property have no real or substantial relationship to the public health, safety, morals, or general welfare, and that such restrictions generally, and as applied to the plaintiff, are arbitrary, unreasonable, and confiscatory. The trial court also held as a basis of its decree that there was a nonconforming use of plaintiff's land at the time of the adoption of the zoning resolution.

This case again presents to the court the constitutional conflict between private property · rights · and the police power of the State and its political subdivisions.

Defendants-appellants predicate their appeal on the following propositions: First, a ·zoning resolution and its amendments are presumed to be valid. (*Kinney* v. *City of Joliet,* 411 Ill. 289; *County of Du Page* v. *Henderson,* 402 Ill. 179.) Second, the decree of the trial court is erroneous. Third, there was no nonconforming use by the plaintiff. Last, the court will not substitute its judgment for that of a legislative body. *County of Du Page* v. *Henderson,* 402 Ill. 179.

Plaintiff-appellee's answer thereto in substance is: First, the legislative determination as to what is a proper exercise of police power is not conclusive. (*2700 Irving Park Building Corp.* v. *City of Chicago,* 395 Ill. 138.) Second, the propriety of a zoning regulation or of its application in a particular case must be decided by the court from the facts and circumstances in evidence. (*Forbes* v. *Hubbard,* 348 Ill. 166.) Third, that the evidence and findings compel the conclusion reached by the trial court.

In this case voluminous testimony, both oral and documentary, was taken by a special master in chancery. The special master made eighty separate findings of fact in his report, objections to six of which by the defendants were overruled by the trial court. The plaintiff objected to numerous of the master's findings, and the trial court sustained in part such objections to part of the findings and made ten additional findings as prayed by the plaintiff.

An examination of the record clearly discloses that most of the basic facts involved in the present case, as found by the master and approved and confirmed by the trial court, are supported by the evidence. Such approved and confirmed findings will not be disturbed by this court unless they are against the manifest weight of the evidence. *Wurth* v. *Hosmann,* 410 Ill. 567; *Zeta Building Corp.* v. *Garst,* 408 Ill. 519; *Schmalzer* v. *Jamnik,* 407 Ill. 236.

There being substantial and credible evidence on both sides of each question presented it is believed that the

following factual conclusions of the master and trial court must be accepted by this court as the facts in this case.

On October 5, 1949, the board of supervisors of Knox County adopted a zoning resolution pursuant to the County Zoning Act. (Ill. Rev. Stat. 1951, chap. 34, pars. 152i *et seq.*) The first notice of township hearings preparatory to enactment of such zoning resolution was published on August 2, 1949.

The zoning resolution divides the unincorporated area of Knox County into seven districts, which resolution regulated, restricted and limited the location of businesses, buildings, and use in the various districts for the stated purposes of promoting public health, safety, morals, and general welfare, conserving the values of property throughout the county, and lessening or avoiding congestion in the public streets and highways. Strip mining of coal in all the districts except the "G" district was prohibited. Approximately 90 percent of the unincorporated area of the county lies outside of the "G" district.

The practice of mining coal by the open cut or strip method results in the top soil being turned under and the topography left in a broken and rough condition. At the inception of the strip-mining operation, a large excavation is made, about 90 feet in width, extending from the top surface to the coal seam. The excavated material from the opening is deposited to one side. The piles of this excavated material are known as spoil piles or ridges ranging in height from 20 to 60 feet. As the mining operation progresses, the excavating machines proceed laying aside the materials overlying the coal so that the area is left in a series of long ridges with peaks about 50 feet apart and with intervening valleys from 10 to 60 feet in depth.

The plaintiff owns in fee, or controls by lease, option, or contract to purchase, 2987½ acres of land containing approximately 1300 coal acres situated in the "C" district of Salem Township of Knox County, which was

immediately north and adjacent to the "G" district. Such interests were acquired by the plaintiff beginning in October, 1932, long before the zoning resolution was proposed, for the express purpose of mining the coal underlying such land by the strip method. The cost thereof to plaintiff was $464,523 and a remaining contractual liability of $200,732. Approximately 5,500,000 tons of number 5 coal and 1,000,000 tons of number 6 coal, with a total gross value in excess of $25,000,000, can be recovered by plaintiff from said property. Such property has a value of $5000 per acre for strip-mining purposes and an average value of $250 per acre for ordinary farming purposes. Prior to the adoption of the zoning resolution, plaintiff had surveyed and mapped most of said real estate, drilled more than 1700 test drill holes, determining the extent of coal underlying the land which could be recovered by strip mining. Prior to the zoning resolution, plaintiff had also constructed a new haulage road on the property and a new power line thereon for use in connection with future mining of coal underlying said real estate and in the present mining operations of plaintiff in the "G" district immediately south of the "C" district. Also prior to the adoption of the resolution, plaintiff had invested in plant equipment and other facilities to be used in strip mining the lands in dispute, along with lands immediately to the south thereof, a total sum, of $3,431,561.32, which at the time of trial had a depreciated value of $753,028.78.

The coal under such land cannot be practically, economically or safely recovered by any process other than strip mining. Plaintiff, however, at the time of the adoption of the zoning resolution and at the time of trial, had not opened any pit or recovered any coal by any mining method in the "C" district.

Knox County is predominantly an agricultural community lying in the heart of the corn belt and possessing soil and climatic conditions giving agricultural yields per acre

in excess of the average yields for the State of Illinois, the principal crops grown being corn, oats, soybeans, and pasture, there being extensive livestock production. Over 92 percent of the land area of the county is devoted to agricultural purposes, one half of which is devoted to pasture. Knox County and Salem Township are both static, as that term is used in planning and zoning, as to conditions that might change them from a rural to urban manner of living. The population of Salem Township decreased from 1360 in 1920 to 1286 in 1940. The population of Knox County increased from 46,727 in 1920 to 52,250 in 1940 to 54,150 in 1950. There was a comparative increase in the population of the city of Galesburg in Knox County during the same period. The decline of population in the rural areas of Knox County has not been the result of strip mining.

The total area of strippable coal in Knox County is about 29,000 coal acres or 6.27 percent of the total area of the county. At the time of the passage of the zoning resolution about 11,000 such coal acres were owned or controlled ·by strip-mining companies. The "G" district, in which strip mining is permitted, has a land area of about 47,000 acres but does not include all of the strippable coal in Knox County or all of the property owned or controlled by mining companies. The land here in question, situated in the "C" district, in which no strip mining is permitted, is immediately adjacent to property owned by plaintiff to the south, located in the "G" district, in which strip mining is not only permitted but in which plaintiff has been actively stripping and removing coal.

The evidence showed that there had been a net gain in assessed value of all property strip mined by plaintiff in Knox County; that the total assessed value of all real estate in Knox County for tax purposes had not been reduced or adversely affected in any way by coal strip-mining activities, and that the assessed valuation for tax purposes of real estate adjacent to land which had been strip mined in Knox

County by plaintiff had not been reduced or adversely affected in any way by such strip mining.

It was also found that strip mining as conducted by plaintiff produces no fumes, smells, dust or objectionable noise and is not dangerous to the public, has no adverse effects on the quality or quantity of ground or surface water, does not result in any increase in insurance rates in the community, does not constitute or create any traffic problems or hazards, does not breed noxious bacteria and is not unsanitary, and that it had not generally depreciated the value of land for agricultural purposes, and that there had been no serious, substantial or consequential depreciation of the value of properties surrounding areas that have been strip mined.

The total present fair cash market value of plaintiff's land in the "C" district for agricultural purposes is $750,000. The value of such land to plaintiff for the strip mining of coal is far greater than its value for agricultural purposes; however, the value of such land for strip mining would cease at the conclusion of mining operations. At the termination of strip-mining operations the land in question would be characterized by spoil-pile areas, unadaptable to agricultural row-crop production and useable only for pasture or forestation. By scientific reclamation and rehabilitation processes pastures can be established having a present fair cash market value of $75 to $100 per acre.

Prior to the adoption of the zoning resolution, specialists in the field of zoning were employed by the county and under their direction a detailed study was made of the county and land uses therein. A preliminary report was submitted to the county, public hearings thereon were held in each township after public notice was given thereof, and the zoning resolution as originally adopted was subsequently amended in certain respects on petition therefor in accordance with procedure and terms specified in the resolution itself for amendment.

At the time of the adoption of the resolution strip mining was taking place about one-half mile from the southwest corner of the land in question owned by plaintiff, and most of the south portion thereof was about a mile and a half from coal stripping operations then taking place to the south in the same township.

The applicable rules governing the validity or invalidity of zoning regulations have long been crystallized by numerous decisions in this and other jurisdictions. It is well established that every person has the right to use his property in his own way and for his own purposes, subject only to the restraints necessary to secure the common welfare. (*Irving Park Building Corp.* v. *City of Chicago,* 395 Ill. 138; *Forbes* v. *Hubbard,* 348 Ill. 166.) In the case of *State Bank and Trust Co.* v. *Village of Wilmette,* 358 Ill. 311, at page 316, the court said: "The privilege of every citizen to use his property according to his own will is both a liberty and a property right. Liberty includes not only freedom from servitude and restraint, but also the right of every man to be free in the use of his powers and faculties to pursue such occupation or business as he may choose and to use his property in his own way and for his own purposes, subject only to the restraint necessary to secure the common welfare."

It is likewise equally well established that reasonable restraints on the use of property in the interest of the common good and bearing a real and substantial relation to the public health, safety, morals and general welfare constitute a valid exercise of the police power. *Pioneer Trust & Savings Bank* v. *Village of Oak Park,* 408 Ill. 458; *People ex rel. Trust Co.* v. *Village of Skokie,* 408 Ill. 397; *Forbes* v. *Hubbard,* 348 Ill. 166.

There can be no question as to the rule that where the question of reasonableness is fairly debatable the courts will not interfere with the legislative judgment and will not substitute their judgment for that of the legislative depart-

ment, as established in the *County of Du Page case* and other cases cited by defendant. However, such principle of law does not foreclose the courts from exercising their judicial function and, as stated in the *Forbes case,* the reasonableness and propriety of a zoning regulation and its application must be decided by the court from the facts and circumstances in evidence.

Zoning ordinances, to be a valid exercise of the police power, must have a real and substantial relation to the promotion of the public health, safety, morals or welfare. *Pioneer Trust & Savings Bank* v. *Village of Oak Park,* 408 Ill. 458; *People* v. *Village of Skokie,* 408 Ill. 397; *Pringle* v. *City of Chicago,* 404 Ill. 473; *Quilici* v. *Village of Mount Prospect,* 399 Ill. 418; *Irving Park Building Corp.* v. *City of Chicago,* 395 Ill. 138.

As stated in *People ex rel. Kirby* v. *City of Rockford,* 363 Ill. 531, where there is no material relation of the restrictive ordinance to the public good, such ordinance cannot, under the guise of a zoning regulation, either confiscate the property or inflict a substantial financial injury upon the owner thereof.

Mr. Justice Fulton, in the *Pioneer Savings Bank case,* stated the substance of the rule in the following language: "One of the controlling questions for us to determine is whether or not the invasion of the property rights under the purported police power is unreasonable and confiscatory, and, in so determining, we must consider the extent to which property values are diminished by the provisions of the zoning ordinance, and we must give due consideration to testimony in that regard. * * * If the gain to the public by the ordinance is small when compared with the hardship imposed upon the individual property owner by the restrictions of the zoning ordinance, no valid basis for the exercise of police power exists." Zoning laws that result in relatively little gain or benefit to the public while inflicting serious injury or loss on the property owner have

always been held by this court to be confiscatory and void. *People ex rel. Kirby* v. *City of Rockford,* 363 Ill. 531, 536.

If there is a fair difference of opinion as to the reasonableness of the zoning regulation, a court will accept and abide by the decision of the body enacting the restriction. (*Village of Western Springs* v. *Bernhagen,* 326 Ill. 100, 156 N.E. 733 (1927.) As a corollary to this proposition of law is the one that a party attacking the validity of a zoning ordinance has the burden of proving that it is clearly arbitrary and has no foundation in the police power for its existence. (*Village of Western Springs* v. *Bernhagen,* 326 Ill. 100.) The proponents, therefore, in the instant regulation have the advantage of a judicial presumption that it is constitutional.

In determining the validity of the Knox County zoning resolution we thus must look to the facts and circumstances shown by the evidence to determine whether the questioned prohibition of strip mining of the property involved bears a substantial relation to the public health, safety, morals or welfare. (*Forbes* v. *Hubbard,* 348 Ill. 166.) The evidence showed, and the master and the court found, that the strip mining that has already occurred has caused inconsequential depreciation in value of adjacent land, and it appears to be a sound conclusion that if the plaintiff's property in question is strip mined there would be no consequential depreciation in value of surrounding property as a result thereof. Therefore, the restriction as applied to the plaintiff's property cannot be sustained as a measure to protect or conserve other property values.

The record further fails to disclose any substantial relationship between the prohibition of strip mining and the preservation of the community's public health, either as to water resources, drainage, lateral support of roads, noxious fumes or odors, weeds, drownings, predatory animals, or other elements involved in public health and safety.

The damaging impact of the resolution is of a serious nature. The plaintiff will be deprived of 6,500,000 tons of coal of a gross value in excess of $25,000,000. It is prevented from mining 1300 acres of coal that has a value for mining purposes of $5000 per acre. For uses permitted by the resolution, the same land has a value of $250 per acre; the plaintiff's expenditure of $170,000 in preparation for the mining of that acreage is destroyed; its plant and equipment of a value in excess of $3,400,000 will have its lifetime of usefulness curtailed five years. It is contended by plaintiff that such an imposed hardship has no parallel in American jurisprudence.

It is also seriously contended that the resolution will visit an undue burden on the public. There are employed in plaintiff's activities more than 300 men with an annual payroll of $1,500,000; the mining prohibited would provide 300,000 man-days of labor which is equivalent to $9,000,000 in wages; and there would be a loss of $13,000,000 of railroad freight revenues. Strip mining in Knox County produced coal for rail shipment in excess of $8,000,000 in 1948, $6,000,000 in 1949, $7,000,000 in 1950. The foregoing was realized from 300 acres annually, whereas from the remaining 430,000 acres of farm land in Knox County, the agricultural products for 1945 amounted to $14,600,000. The plaintiff pays more than 20 percent of the personal property taxes in the two townships where the strip mining is conducted, and pays an annual income tax of $1,000,000. The State collects a 2 percent sales tax on the gross price of coal mined and the Federal Government a transportation tax of four cents per ton on the million tons of coal annually mined by plaintiff; also, plaintiff's employees pay a total aggregate income tax of $1,500,000 and the employees reside locally and pay other taxes of considerable size. Another Illinois coal corporation has options on three thousand ninety-five acres of land in Knox County, con-

taining 15,000,000 tons of coal. Plans of that company to mine that coal will be terminated if the resolution is held valid, thus that company will be prevented from spending a contemplated sum of $2,333,000 and the employing of 175 men with an annual payroll of $1,000,000. Destruction of the local source of coal will result in an increase of $1.65 per ton to local consumers. The foregoing is a fair outline of the damaging effect to the plaintiff and the public of the operation of the resolution under consideration. The uncontradicted proof established those factors. Therefore, it is appellee's contention that the zoning legislation before us is confiscatory and void because, relatively, there is little gain or benefit to the public in contrast to the serious injury imposed upon the property owner.

The defendants seek to sustain the resolution principally upon the theory that good farm land is limited and must be conserved; that there is an unlimited supply of coal available; that strip mining the coal permanently destroys good farm land for agricultural purposes; that such land becomes valueless and therefore produces no tax revenue; that it would thus transfer a disproportionate burden onto adjoining landowners, as the incidence of taxation will inevitably fall upon the land not in the strip-mining area; and that, as a result of the curtailment of tax revenues, the roads, the schools, the county and township governments will deteriorate.

The master in chancery found that revenues in Knox County were not appreciably reduced, and that lands adjoining strip-mining operations were reduced in value but slightly, and that they were not adversely affected in any other manner. However, the master did find that the fair cash value of the land in question after the coal operation would be $5 per acre. If such is a fact, it is unreasonable to assume that the ultimate owner of such lands will not cause valuation of his lands to be scaled down to correspond with its actual value. The master in chancery sus-

tained the resolution on the ground that the future economy of Knox County would be considerably damaged if 6 percent of its farm land is destroyed for agriculture purposes.

The plaintiff has introduced volumes of proof to sustain its contention that the spoils land remaining after the stripping operation is far from valueless. There was much testimony of a convincing character to demonstrate the possibility of a conversion of the spoils area into commercially profitable projects. Qualified experts in the fields who have studied similar problems in various States related their experiences with many types of reclamation. The texture and fertility of the soil are obviously important factors in determining the usefulness of the spoils land. The soil in Knox County is adapted to agricultural and grazing purposes, being high in organic content and fairly fertile. Experience in Kansas and Indiana indicates that lands comparable to the area under consideration have been converted into excellent pasture land producing clover, alfalfa, lespedeza and in fact all types of legumes and grasses. Also, profitable conversions lie in the planting of trees, such as pines for Christmas trees; hardwoods for lumber; locust for fence posts; and fruit trees, principally apples and peaches. Paradoxical as it may seem, in some areas the land after being disturbed by the strip mining processes is more productive than when undisturbed. In southern Illinois there are many instances of such a change. An explanation of this phenomenon lies in the fact that the land becomes aerated by breaking up the hardpan and tight layers of clay, thus permitting moisture to reach the roots of planted vegetation, also the lime rock is broken, thus counteracting the acidity of the soil. Consequently, many lands in strip-mining areas heretofore not cultivated are now found to be productive of fruit trees, pulpwoods and grasses. They are found to be high in mineral nutrient, having all the factors necessary for plant growth. Giving full consideration to all of the testimony

on the subject prompts the opinion that the spoils land in the area in controversy will not be entirely valueless, and the prophecy of great damage to the agricultural economy of Knox County, voiced by the defendants, is not justified.

The destruction of value in the land involved is very great. For coal purposes it is twenty times as valuable as when restricted to agriculture. We can find no parallel to such an attempted invasion of property rights. We can find no case in Illinois sustaining a zoning regulation prohibiting a specified use where that use was worth more than three times the permitted use.

A brief survey of the zoning cases in this State will throw considerable light upon this phase of the issue. In *Forbes* v. *Hubbard,* 348 Ill. 166, property restricted to residential use was worth 7 to 12 times more for commercial purposes, and the restriction was held invalid. In *People ex rel. Lind* v. *City of Rockford,* 354 Ill. 377, it appeared that property was worth 13 times more for use as a filling station than for a residence. The court held that the owner could not be prevented from using the property for a filling station. In *State Bank and Trust Co.* v. *Village of Wilmette,* 358 Ill. 311, it appeared that the property was worth 4 times more for use as a garage than it was for permitted commercial uses, and the zoning was held to be confiscatory and invalid. In *Ehrlich* v. *Village of Wilmette,* 361 Ill. 213, it appeared that property was worth 7 to 8 times more for apartment and commercial purposes than it was for single-family residence. An ordinance restricting it to residential use was held invalid. In *Reschke* v. *Village of Winnetka,* 363 Ill. 478, the property involved was worth 2½ to 8½ times more for commercial and industrial purposes than for residential purposes. The court held that the owners could not be confined to residential uses. The court, in *People ex rel. Kirby* v. *City of Rockford,* 363 Ill. 531, held an ordinance lacking in due process that prohibited a use for a gasoline station which was 3 times more valuable than for

the permissive residential use. A prohibition against the use of property for other than residential purposes was held invalid in *Taylor* v. *Village of Glencoe,* 372 Ill. 507, where it appeared that the property was worth 4 times more for commercial or business purposes. In *Offner Electronics, Inc.* v. *Gerhardt,* 398 Ill. 265, a limitation of the use of property to duplex residences was held invalid where it appeared that it was worth twice as much for commercial purposes. In *People ex rel. Joseph Lumber Co.* v. *City of Chicago,* 402 Ill. 321, property was zoned for residence use but was worth from 2 to 6 times more for manufacturing and industrial use. The restriction was held to be unreasonable and lacking in due process. In *Metropolitan Life Ins. Co.* v. *City of Chicago,* 402 Ill. 581, property was worth 3 times more for commercial than apartment use. Zoning prohibiting a commercial use was held confiscatory and unconstitutional. In *Galt* v. *County of Cook,* 405 Ill. 396, a zoning restriction limiting to residential uses property which was worth 7 to 15 times more for business purposes was held unreasonable and unconstitutional. In *Pioneer Trust & Savings Bank* v. *Village of Oak Park,* 408 Ill. 458, it was held that land which was worth twice as much for three-story buildings could not be confined to use for 2½-story buildings.

It will be observed that the conflict in those cases usually involved a prohibition against a property owner using his property for a filling station, apartment building, industrial or commercial enterprise. He could, however, use his property for specified "permissive uses." Such is not so in the present case. Zoning that prevents mining has the effect of prohibiting any use at all of mineral property. Authorization to use the surface for farming purposes provides no use for the mineral property beneath it. The plaintiff has been denied the right to mine 6,500,000 tons of coal that lies beneath 1300 acres of land. The instant resolution does not regulate the use of that property but denies its use with-

out compensation. In *Tews v. Woolhiser*, 352 Ill. 212, the court had before it an analagous situation. There, a lot in Winnetka, surrounded with railroad and industrial activity, was restricted to residential use. It had considerable value for commercial purposes, but for residence purposes it was valueless. In holding the ordinance unconstitutional, the court said, at page 221: "It must not be overlooked that zoning which courts can approve must have as its basic purpose the setting aside of areas of property for specific uses. Zoning which admittedly limits property to a use which cannot reasonably be made of it cannot be said to set aside such property to a use but constitutes the taking of such property without just compensation. Use of property is an element of ownership therein. Regardless of the opinion of zealots that property may properly, by zoning, be utterly destroyed without compensation, such principle finds no support in the genius of our government nor in the principles of justice as we know them. Such a doctrine shocks the sense of justice. If it be of public benefit that property remain open and unused, then certainly the public, and not private individuals, should bear the cost of reasonable compensation for such property under the rules of law governing the condemnation of private property for public use. It lies not within the power of a municipality to so zone property as to render it worthless. Such is not zoning—it is confiscation."

It will be noted that there no permissive use was available for the surface property. Here, no permissive use is available for the mineral property. In each instance the usefulness of the property is destroyed. Following the logic of the *Tews case,* if the public is interested in the plaintiff not mining its coal, the public and not the corporation should bear the cost of such restrictive measure. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 67 L. ed. 322, 28 A.L.R. 1321, considers an analagous situation. In this case a mining company owned coal in place. In an attempted

exercise of police power, the State made it impossible to recover the coal. The coal deposit was under a city, and it appeared impossible to recover the coal in conformity with the statute. Delivering the opinion of the court, Justice Holmes, at page 414, said: "It is our opinion that the act cannot be sustained as an exercise of the police power, so far as it affects the mining of coal under streets or cities in places where the right to mine such coal has been reserved. As said in a Pennsylvania case, 'For practical purposes, the right to coal consists in the right to mine it.' Commonwealth v. Clearview Coal Co., 256 Pa. St. 328, 331. What makes the right to mine coal valuable is that it can be exercised with profit. To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it. This we think that we are warranted in assuming that the statutes does. * * * The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in 'the decisions upon the Fourteenth Amendment. Hairston v. Danville & Western Ry. Co., 208 U.S. 598, 605. When this seeming absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States. * * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

In many jurisdictions zoning ordinances have been held valid where they had the effect of preventing the removal of some natural product from the land. Therein no distinction is drawn between the erection of buildings, the estab-

lishment of a commercial enterprise and the extraction of mineral. One of the cases relied upon by appellants is *Town of Burlington* v. *Dunn,* 318 Mass. 216, 61 N.E. 2d 243— *certiorari* denied 326 U.S. 739. The ordinance under attack prevented the stripping of top soil in the town of Burlington, Massachusetts. The court, in sustaining the validity of the measure, observed that Burlington was a small town, residential in character, located within commuting distance of Boston. There were fifty residences in close proximity to the land sought to be relieved of the prohibition. Here it was shown that the soil was removed by first scraping it into piles with a "bulldozer" and removing it by means of steam shovels and trucks; that the process of removal was likely to produce disagreeable dust and noise and to leave in its wake a desert area where weeds and brush would thrive; that such an unsightly waste would likely depress values of other lands in the neighborhood and render them less valuable for homes; that a repetition of such a process would be disastrous to the locality; that all those considerations had a bearing upon public welfare in a constitutional sense. The court, viewing the situation under debate from the defendant's standpoint, observed that stripping of the soil was not the only profitable use to which the land could be put, that "top soil" could be obtained any time from anywhere, without adversely affecting a community of homes. We only must mention that coal is not as plentiful as top soil, and that the neighboring properties in the case before us are only slightly affected, to provide valid distinguishing features between the *Burlington* and *Knox County cases.*

Another case which deals very exhaustively with many of the legal issues before us is *Marblehead Land Co.* v. *City of Los Angeles,* 47 Fed. 2d 528. Therein a Los Angeles zoning ordinance prevented oil-well drilling operation in a zone where the oil operator owned land and had expended large sums in exploration tests. The prohibition was upheld as a

valid exercise of the city's zoning powers. Although three wells reaching a depth of 14,000 feet had been drilled without striking oil, the opinion proceeded upon the assumption that appellant's land was oil bearing. The salient facts that prompted the result reached are: the land area involved is surrounded by residental developments, including expensive homes, highly improved streets, curbs, sidewalks, lights and other utilities; that no adjacent property is of an industrial character; that the operation of oil wells would cause the atmosphere to become contaminated and polluted with noxious fumes and odors, causing serious discomfort, damage and inconvenience to owners of property immediately surrounding plaintiff's land; that living conditions would become greatly depreciated; that obnoxious and disturbing noises would make living conditions less desirable; that there would be created a fire hazard, imminent at all times, thus causing all properties surrounding plaintiff's operation to become appreciably reduced in value for residential purposes; that the area involved is rolling and contains attractive and beautiful inclines and declines which add much to the residential character of the land; that the location of derricks and tanks would produce an ugliness in such an attractive environment.

Need we point out that the record in the present controversy is barren of any evidence indicating that the contemplated operation of the plaintiff is a menace, of any consequence, to the general welfare, present or future, of the property owners in Knox County?

At page 532, the court, in the *Marblehead case,* said: "While this decision deals with the right of an owner to develop its inherent potentialities by producing therefrom its mineral wealth, there does not seem to be any distinction in principle between depriving an owner of the right to develop such inherent qualities of the land and a regulation which prohibits an owner from erecting upon his land structures which he believes will, and which in fact will,

enhance the value of his property. * * * In each case there is a definite loss of value which is prohibited by the constitution as a taking of private property without compensation unless such taking is in the exercise of the police power. The fundamental question, then, in each case, is whether or not the owner has been deprived of property by legitimate exercise of the police power of the state in its effort to promote the general welfare of its citizens. If there is any difficulty between the taking of the unearned increment by zoning ordinances and the taking of the inherent value of the soil or its contents, it arises from the fact that it might be deemed unreasonable to prevent a man from developing natural gas upon his property and reasonable to prohibit the erection of gas works, because in the former case gas works can be erected in other suitable zones or districts in the city, while in the case of natural gas it must be reproduced from the land in which it exists." The court, at page 531, said: "The right of the appellee city to pass the ordinance in question need not be confined to the more recently developed phase of police power involved in zoning ordinances which undertake in a measure to direct the future growth of the city, but may also be predicated upon the power of the city to protect its inhabitants from fire hazard and from noxious gases; that is to say, the power exercised by the city authorities in enacting the ordinance may be based upon that branch of the police power which deals with the public safety. It cannot be doubted under the authorities that, if there is a menace to the health and property of its citizens from the proposed drilling operations, under the police power as long established and exercised the ordinance would be a valid exercise of such police power. * * * It would seem clear that under the general power of a city to regulate its growth, the appellee city would be entitled to restrict the use of appellant's property to such purposes as were permitted in the zone in which it had been included unless under all

the circumstances as disclosed by the evidence such result would be so unreasonable and arbitrary as to justify the interference of the court under well-established limitations upon the police power of the city. In view of the surroundings of the appellant's property, the fact that it is in the line of development of the residential district of Los Angeles, that expensive dwellings had already been erected in the neighborhood, that adjacent property has been improved by opening streets and paving and sidewalking the same, there would seem to be little doubt of the right of the city under zoning ordinance to prevent the use of appellants' property for industrial and manufacturing plants or the erection of gas works which would be entirely out of harmony with the development of the neighborhood. * * * It is a matter of common knowledge that in some cases oil wells, particularly in new territory, have gotten beyond control and resulted in disastrous·fire. Such a well in the heart of a great city would be an intolerable nuisance, and it is conceded could be prohibited by the city council in the exercise of its police power. In an outlying and relatively unsettled district it is obvious that the fire hazard would be much less, if not entirely negligible. The city council presumptively acted upon the theory that such a hazard was real and substantial. The trial court, after hearing the evidence, held it to be a fact that the fire hazard was real and substantial. There is testimony to sustain this conclusion. The question, then, is whether this court, acting upon the evidence in the record to the contrary, and upon its general knowledge concerning production of oil, shall declare that the conclusions of the city council and of the trial judge are so arbitrary and unreasonable that they may be justly disregarded as determining the rights of the appellants."

Other cases relied upon by appellant are: *City of Pittsfield* v. *Oleksak,* 313 Mass. 553, 47 N.E. 930; *People* v. *Calvar Corp.* 286 N.Y. 419, 36 N.E. 2d 544; *Pacific*

*Palisades Assn.* v. *City of Huntington Beach,* 196 Cal. 211, 237 Pac. 538; *People* v. *Hawley,* 207 Cal. 395, 279 Pac. 136; *West Brothers Brick Co.* v. *Alexandria,* 169 Va. 271, 192 S.E. 881; *Terrace Park* v. *Errett,* 12 Fed. 2d 240; *K & L Oil Co.* v. *Oklahoma City,* 14 Fed. Sup. 492. Every one of these cases involves city zoning and relates to a situation where the forbidden use safeguards surrounding properties from threatened serious damage.

We have quoted quite extensively from two of the cases relied upon by appellants. It is true that therein ordinances were held valid where the prohibition destroyed the use of a product of the land. The record, particularly in the *Marblehead case,* abounds with proof of untold damage of a ruinous character to a beautiful, expensive and rapidly growing residential district. We have no comparable factor in the case before us, which renders the precedent in that case of little value.

In this State is the case of *Northern Illinois Coal Corp.* v. *Medill,* 397 Ill. 98, which holds that a strip-mining operation is not a conservation measure. In that case a legislative attempt was made to require all coal companies to level the spoil banks. Here the resolution undertakes to block the creation of spoil banks. Chief Justice Gunn, speaking for the court, stated at page 105: "* * * the State has no authority, under the guise of a conservation theory, to compel a private owner, at his own expense, to convert his property to what it considers to be a higher or better use. * * * Such a requirement would obviously be a confiscation of property."

The reasoning that there condemns the State measure as unconstitutional is just as logical when applied to a county resolution.

The record and the findings in the instant case establish beyond the possibility of challenge that there is no relation between the prohibition against strip mining and public health, safety, morals or general welfare. The evidence

and the findings clearly demonstrate that the gain from the prohibition is negligible while the hardship visited upon the plaintiff is great. The plaintiff's coal is being confiscated without any compensation. Not overlooking the rule that all zoning enactments are sheltered with a presumption of validity, and the genuine respect that must be accorded the legislative wisdom of the enacting body, we are of the opinion that the trial court's decision, holding that the Knox County zoning resolution, to the extent that it regulates and restricts the strip mining of coal on plaintiff's property, is unconstitutional and void as having no real or substantial relation to the public health, safety, morals, comfort or general welfare, and as being arbitrary, unreasonable and confiscatory, is correct. By this conclusion we do not mean to imply that all zoning regulation prohibiting the strip mining of minerals is necessarily invalid. To the extent to which the decree of the trial court may be construed to apply to property in a different situation and involving different physical facts, it is inappropriate and the decree is modified to apply only to the property in question.

The trial court gave as one of the reasons for its conclusion that the plaintiff's use of the land in question prior to the passage of the zoning resolution constituted a nonconforming use which cannot be prohibited by resolution. Having reached the same ultimate result as the trial court, the correctness of this particular ruling is no longer an issue and is not passed upon by this court.

Plaintiff's complaint also challenged the constitutionality of the County Zoning Act, as well as the Knox County zoning resolution, as granting special privileges, as being void for indefiniteness, and as delegating legislative powers to administrative officials. However, the trial court did not pass upon the constitutionality of the County Zoning Act or of the county zoning ordinance in any of these respects. We have repeatedly held that constitutional questions raised

but not passed upon by a lower court are not reviewable. *Grutzius* v. *Armour and Co.* 377 Ill. 447; *People ex rel. Rago* v. *Lipsky,* 390 Ill. 70; and *Ryan* v. *City of Chicago,* 363 Ill. 607.

As to the last contention that awarding execution against the county of Knox was error, it is correct insofar as it is the law that execution cannot issue against a county. Section 34 of the Counties Act, (Ill. Rev. Stat. 1953, chap. 34, par. 34,) provides that execution shall not in any case issue against the lands or other property of a county but when judgment is rendered against a county the county board shall direct an order to be drawn on the county treasurer for the amount of the judgment and costs, which order shall be paid as other county debts. Defendants do not argue that costs cannot be assessed against the defendant county nor do they argue that there was an abuse of discretion in assessing costs against the defendant county. Furthermore, the individual defendants, against whom costs were taxed and executions ordered to issue, were parties defendant to this litigation as public officials and officers and members of the Knox County Zoning Board of Appeals. Public officials who represent the interests of the public in litigation, such litigation not having been made necessary by any negligence or misconduct on the part of such officers, are not liable for costs. (*Hammond* v. *People,* 32 Ill. 446; *Walling* v. *Norfolk Southern Railroad Co.* 162 Fed. 2d 95, 14 Am. Jur. "costs," sec. 37, page 24.) If the language of a decree is broader than is required or permitted by law, it will be limited by construction so that its effect shall be such only as is needed for the purposes of the case and in conformity with the law applicable thereto. (*People* v. *LaMothe,* 331 Ill. 351; *Neidhardt* v. *Frank,* 325 Ill. 596.) We therefore conclude that the trial court was in error in taxing costs against the individual defendants, who were parties to this litigation in their capacity as public officials, and in ordering execution to issue against

the county, but that such taxation of costs against defendants should have been limited to the defendant County of Knox and judgment only therefor entered, without ordering issuance of execution therefor. However, inasmuch as this case involved a close legal question of vital importance to both parties and the litigation was in good faith, an apportionment of the costs would be equitable. The decree of the trial court as to taxation of costs is therefore modified to apportion the costs equally between the plaintiff and the county of Knox.

In view of the foregoing analysis, it is our considered opinion that the decree entered should be affirmed as modified.

*Decree affirmed as modified.*