(No. 70105.

BEVERLY BANK, as Trustee Under Trust No. 8—0200, Appellee, v. THE ILLINOIS DEPARTMENT OF TRANSPORTATION *et al.*, Appellants.

*Opinion filed September 19, 1991.*

BILANDIC and FREEMAN, JJ., took no part.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and John A. Simon, Assistant Attorney General, of Chicago, of counsel), for appellants.

Michael G. Cainkar and Louis F. Cainkar, of Chicago, for appellee.

JUSTICE CUNNINGHAM delivered the opinion of the court:

The Illinois Department of Transportation, defendant, denied an extension of a construction permit to the plaintiff, Beverly Bank, based solely on recently enacted flood control legislation. (Ill. Rev. Stat. 1989, ch. 19, par. 65g.) Plaintiff is trustee of a land trust held for the benefit of Michael J. O'Malley. Section 18g, effective November 18, 1987 (Pub. Act 85—905), prohibits all new residential construction in the 100-year floodway in the area served by the Northeastern Illinois Planning Commission.

The circuit court of Cook County held section 18g unconstitutional as applied to plaintiff's properties, reversed the decision of defendant to deny the permit extension and ordered defendant to grant the permit extension. Defendant brings a direct appeal to this court. (134 Ill. 2d R. 302(a).) The issue is whether the circuit court erred in holding section 18g unconstitutional as applied to plaintiff's properties.

Plaintiff owns two lots in the Village of Flossmoor. Both lots are located in the Butterfield Creek floodway and are part of the 100-year floodway. The 100-year floodway is a model based on a statistical projection of the flooding which would result from the worst storm

likely to occur in 100 years. The entire area which would be at or under the water level in such a flood is included in the 100-year floodway.

The two parcels of land owned by plaintiff are adjacent to each other and are zoned exclusively for single-family use. Plaintiff sought in 1979 to improve the lots by building two single-family dwellings, one on each lot. Because all or a substantial portion of each lot is situated in a designated flood plain, plaintiff was required by the law in effect at that time to secure a permit from defendant before beginning construction. Ill. Rev. Stat. 1979, ch. 19, par. 65f.

In September 1979, plaintiff applied to defendant for a permit to fill in the flood fringe area to enable two homes to be built above the 100-year flood level. In support of the application for the permit, plaintiff supplied surveys and engineering data representing that plaintiff's grading, use of compensatory fill, and method of construction would not raise or increase the breadth of the flood plain or otherwise have a detrimental effect on the adjoining area.

The Village of Flossmoor, by way of letter dated October 29, 1979, expressed great concern to defendant about the location of the two proposed homes in the floodway. Flossmoor noted that a wastewater lift station and a water treatment plant were located across the road from the proposed dwelling sites. Flossmoor cautioned that very serious consideration must be given to the effect any aggravation of existing floodway conditions would impose on these public facilities. Flossmoor stated that the two properties in question had been inundated with flood water in the past, and that an adjacent property, which was built above the flood of record, had been completely surrounded by flood waters during peak storm conditions.

Defendant performed its own test to determine the validity of the proposed construction. At that time, there was in force a requirement that any new construction in the floodway must not increase the flood level. (Ill. Rev. Stat. 1979, ch. 19, par. 65f.) In March 1980, an engineer from the chief flood plain management division of defendant, David R. Boyer, concluded that "the proposed construction *** will actually decrease the flood profile (From 652.8 to 652.7) and will also decrease the flood velocities (From 2.42 ft./sec. to 2.04 ft./sec.). This would indicate that there will be no increase in the flood damage potential of the adjacent flood plain properties."

According to plaintiff, the application process lingered until the fall of 1984, at which time plaintiff reapplied for the permit. Plaintiff relied on the previously submitted engineering studies and reports and newly revised engineering studies and reports. At this time, Flossmoor did not object to the issuance of the permit. Defendant issued the permit on September 17, 1985. The permit specified that "[i]f the work permitted is not completed on or before Dec. 31, 1988 this permit shall be void."

Plaintiff unsuccessfully sought the requisite building permits from Flossmoor. Flossmoor denied the permits because of the existence of plaintiff's property in a flood plain. Plaintiff states it brought suit against Flossmoor in the circuit court of Cook County to compel issuance of the building permits. It appears from the record that this suit, which is separate from the instant litigation, is pending.

Plaintiff requested from defendant an extension of the construction permit on December 14, 1988. Plaintiff stated in its request that it was unable to begin construction due to the unlawful actions of Flossmoor in refusing to issue a building permit. Defendant refused plaintiff's request in January 1989 based solely on section 18g.

Defendant did not respond to plaintiff's subsequent request for reconsideration of the denial. At this point, plaintiff began the instant litigation. Plaintiff brought suit in the circuit court for administrative review of defendant's denial of the extension of the permit pursuant to the Administrative Review Law (Ill. Rev. Stat. 1989, ch. 110, par. 3—101 *et seq.*).

The circuit court stated that the government may prohibit construction on plaintiff's lots only as an exercise of the police power, and "there must be a correlation between the prohibition on building at this location and some concomitant benefit to public welfare achieved by that prohibition." As noted by the circuit court, plaintiff had relied on the original issuance of the permit and had incurred expenses both in the securing of the permit and in filing suit against Flossmoor. The circuit court concluded that, on the record before it, there was no correlation between the detriment to the plaintiff resulting from the prohibition on building the two houses on the flood plain and a benefit to the public welfare. The circuit court held: "Because [section 18g] protects no public interest when it causes a rejection of the plaintiff's development plan, it is invalid as applies to this permit extension." Although the circuit court held section 18g unconstitutional as it applied to plaintiff's properties, the circuit court did not hold section 18g to be facially unconstitutional. The circuit court reversed the denial of the permit extension and ordered defendant to grant the permit extension.

Before the General Assembly enacted section 18g, the law required that any new construction in the 100-year floodway may only be permitted if it would not increase the flood level. Section 18g prohibits all new construction which is not an appropriate use. (Ill. Rev. Stat. 1989, ch. 19, par. 65g(d)(3).) The legislation was enacted in the wake of severe flooding which occurred in the Chi-

cago metropolitan area in September 1986 and August 1987. Approximately 2,200 homes and 150 business establishments in Lake and Cook Counties were damaged in the 1986 flood, and 3,300 people were displaced from their homes. The dollar amount of damage was estimated at $42 million. Approximately 8,894 buildings were affected by flooding or sewer backup in Cook County in the 1987 flood, and approximately 7,501 buildings were affected in Du Page County. The estimated damage exceeded $100 million. During both floods, major traffic congestion resulted. Both floods warranted a presidential disaster declaration.

A Governor's flood control task force was convened in September 1987 to analyze the causes and effects of the 1986 and 1987 floods and to, *inter alia,* advise the legislative leaders of the General Assembly and the Governor on appropriate legislative action. The task force concluded that flood damages are increasing in northeastern Illinois, and that "[s]teps need to be taken immediately to keep the problem from getting any worse." The task force recommended that a "comprehensive approach to stormwater management in Northeastern Illinois be implemented as soon as feasibly possible."

The task force recommended "that substantive legislation be introduced *** to implement programs and authorities to reduce the impact of flooding in the metropolitan Chicago area. The overall focus of the legislation is to prohibit future non-appropriate developments in the 100-year floodway and to provide, initially, the five collar counties and municipalities with the authority to develop regional stormwater management plans." Specifically, the task force recommended: "The Illinois Department of Transportation, Division of Water Resources ***, would prohibit new construction in the 100-year floodway in all streams in northeastern Illinois."

Included in the report was an evaluation, conducted by Robert Bartels, hydraulic engineer for the Soil Conservation Service of the United States Department of Agriculture, of two watersheds: Indian Creek and Butterfield Creek. The task force report noted that these "watersheds *** are currently undergoing a significant increase in developed area and this growth is expected to continue for the next 10 to 20 years." Bartels reached the conclusion that "[e]xisting natural storage (wetlands and similar depression storage areas) in [the Indian Creek and Butterfield Creek] watersheds significantly reduce present peak discharges. The maintenance of this storage was found to be more important than any of the different sizes of on-site detention evaluated for preventing increased peaks with the new development."

According to the task force, these recommendations had the bi-partisan support of State and local officials in the northeastern Illinois region. The task force recommended that the proposed legislation "be given top priority." The recommendation of the task force that all new nonappropriate use construction be prohibited in the 100-year floodway was adopted by the General Assembly and became law effective November 18, 1987. Ill. Rev. Stat. 1989, ch. 19, par. 65g.

The General Assembly has determined that defendant may only issue permits for new construction which is an "appropriate use of the designated 100-year floodway." (Ill. Rev. Stat. 1989, ch. 19, par. 65g(b).) " 'New construction' means the construction of any new building or structure or the placement of any fill or material, but does not include the repair, remodeling or maintenance of buildings or structures in existence on the effective date of this amendatory Act of 1987." Ill. Rev. Stat. 1989, ch. 19, par. 65g(d)(2).

The General Assembly specifically determined what would and would not be an appropriate use of the floodway:

> "(3) 'Appropriate use of the floodway' means use for (i) flood control structures, dikes, dams and other public works or private improvements relating to the control of drainage, flooding or erosion; (ii) structures or facilities relating to the use of, or requiring access to, the water or shoreline, including pumping and treatment facilities, and facilities and improvements related to recreational boats, commercial shipping and other functionally dependent uses; and (iii) *any other purposes which the Department determines, by rule, to be appropriate to the 100-year floodway, and the periodic inundation of which will not pose a danger to the general health and welfare of the user, or require the expenditure of public funds or the provision of public resources or disaster relief services. Appropriate use of the floodway does not include construction of a new building unless such building is a garage, storage shed or other structure accessory to an existing building and such building does not increase flood stages.*" (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 19, par. 65g(d)(3).)

Under defendant's rules which implement the new flood control legislation, defendant may only extend the expiration date of a permit if the permitted activity is in compliance with the rules of the department at the time of the request. 12 Ill. Reg. 20547 (eff. Nov. 29, 1988).

Plaintiff argues that section 18g is unconstitutional as it applies to its properties. Plaintiff acknowledges that a presumption of validity exists in favor of land use regulations, but argues that the presumption of validity "may be dissipated by a showing that the public welfare does not require the restriction of use and resulting loss to the property owner." (*Village of Oak Park v. Gordon* (1965), 32 Ill. 2d 295, 296.) According to plaintiff, the record does not reflect any connection between defend-

ant's denial of the permit extension and the promotion of the public health, safety and welfare.

Plaintiff further argues that this court must not give "blind deference" to the General Assembly's express prohibition of new, nonappropriate construction, but must balance the individual hardships imposed on plaintiff by application of section 18g against the benefit to be gained by the public. According to plaintiff, this court must engage in a case-by-case factual inquiry to determine whether section 18g is unconstitutional as applied to any given piece of property in the 100-year floodway on which the property owner wishes to construct a new residence. Plaintiff argues that this court must follow the analysis set out in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40.

In *La Salle National Bank*, the court set out several of the factors which may be taken into consideration in determining the validity of a zoning ordinance as it is applied to a particular piece of property:

"(1) The existing uses and zoning of nearby property, [citations], (2) the extent to which property values are diminished by the particular zoning restrictions, [citations], (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public, [citations], (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner, [citations], (5) the suitability of the subject property for the zoned purposes *** [citations], and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. [Citations.]" *La Salle National Bank*, 12 Ill. 2d at 46-47.

The municipal zoning ordinance at issue in *La Salle National Bank* restricted the property at issue to single-family residences. The plaintiff wished to use the property for commercial purposes. The facts in *La Salle National Bank*, as found by the master in chancery and

accepted by the trial court, showed that the zoning ordinance ignored the character of the neighborhood, as factories, warehouses and office buildings, a recreational building, tavern, etc., were in the immediate area. The zoning ordinance also ignored the traffic situation, the highest and best use of the property, and the fact that several adverse factors existed to residential development. Significantly, the *La Salle National Bank* court determined there would be no gain to the public by limiting the use to residential purposes and a great financial loss to the plaintiff. As noted by the court in *La Salle National Bank*:

> "When it is shown that no reasonable basis of public welfare requires the limitation or restriction and resulting loss, the ordinance fails and the presumption of validity is dissipated. [Citation.] The law does not require that the subject property be totally unsuitable for the purpose classified but it is sufficient that a substantial decrease in value results from a classification bearing no substantial relation to the public welfare." *La Salle National Bank*, 12 Ill. 2d at 47-48.

Plaintiff also relied upon *Midland Electric Coal Corp. v. County of Knox* (1953), 1 Ill. 2d 200, and *Village of Oak Park v. Gordon* (1965), 32 Ill. 2d 295. In *Midland Electric*, the court determined that a county zoning resolution which prohibited the use of plaintiff's land for strip mining was unconstitutional as applied to plaintiff's property. The court in *Midland Electric* stated, "In determining the validity of the \*\*\* zoning resolution we thus must look to the facts and circumstances shown by the evidence to determine whether the questioned prohibition of strip mining of the property involved bears a substantial relation to the public health, safety, morals or welfare." (*Midland Electric*, 1 Ill. 2d at 210.) The court determined that the record was void of any evidence that plaintiff's proposed strip mining was a menace to

the general welfare. It was also found that plaintiff's land, for purposes of coal mining, was 20 times as valuable as it would be if restricted to agricultural purposes.

In *Gordon*, the court found a village ordinance limiting all rooming houses to only two rooms unconstitutional as applied to the defendant's rooming house. Under previous certificates of occupancy issued to the defendant by the village, defendant had been allowed to rent four rooms, merely establishing a legal nonconforming use.

The record in *Gordon* contained no evidence that the public interest would be served by requiring the defendant to alter his property to accommodate two rooms instead of four, while it was undisputed that the defendant would suffer a financial loss if he were so required. Because there was no apparent public need, the defendant's property right to continue an established nonconforming use was upheld and the village ordinance was held unconstitutional as applied to the defendant. The court in *Gordon* concluded: "Each case must be judged upon the particular facts of that case with due consideration given to the respective interests of the public and the individual property owners." *Gordon*, 32 Ill. 2d at 298.

Defendant argues that this court may not engage in the *ad hoc* case-by-case factual analysis urged by plaintiff. Defendant points out that when a court hears a challenge to a zoning ordinance as it is applied to a particular piece of property, the aggrieved property owner is usually complaining of what she or he alleges is a discriminatory abuse by a local public body. In such a situation, the principal considerations involve the existing uses and zoning of nearby properties. Also involved is consideration of whether the burden on the property owner bears a substantial relation to the public welfare.

This is, of course, precisely what happened in the zoning cases relied on by plaintiff. In each case, the burden on the property owner did not advance a public interest in any substantial way, and the zoning ordinance was held to be unconstitutional as applied.

In the instant case, plaintiff challenges section 18g as being unconstitutional in application to its properties. Defendant, however, argues that plaintiff's challenge is, in fact, a facial one. It is the change from the prior law, which permitted construction of a new residence in the 100-year floodway when no adverse flood impact was shown, to the current law, which prohibits all construction of new residences in the 100-year floodway, which plaintiff argues is unreasonable. Defendant points out that plaintiff does not argue that defendant abused its discretion in the application of section 18g. Because section 18g specifically allows for no variance or special use when it comes to the construction of a new residence in the 100-year floodway, defendant contends that the court must test plaintiff's challenge as a facial attack on the statute. We agree. Section 18g prohibits all new residential construction in each area designated as being within the 100-year floodway. This prohibition is without exception and is applied in a completely nondiscriminatory manner: defendant is required to refuse to issue or extend a permit to begin construction of a new residence in the floodway.

If the court were to review, as plaintiff urges, the constitutionality of section 18g as it applies to a particular piece of property by engaging in an *ad hoc* factual determination, the court would, in effect, be holding the class-wide prohibition on new residential construction unconstitutional on its face for failing to provide for a variance or special use. The court may not judicially create exceptions to this prohibition by engaging in individual factual evaluations with regard to each parcel of land

which lies within the floodway in each instance in which a property owner desires to build a house.

As noted by the court in *Chicago National League Ball Club, Inc. v. Thompson* (1985), 108 Ill. 2d 357, 372:

"The creation of classifications is for the judgment of the legislature, and its amending or modifying is not for courts to decide. [Citation.] Classifications are not required to be precise, accurate or harmonious so long as they accomplish the legislative purpose."

Defendant argues that this court must uphold the prohibition of new residential construction in the 100-year floodway if such prohibition is rationally related to a legitimate State interest, relying on *Thompson*, wherein this court stated:

"When a classification under a statute is called into question, if any state of facts can reasonably be conceived to sustain the classification, the existence of that state of facts at the time the statute was enacted must be assumed." (*Thompson*, 108 Ill. 2d at 368-69.)

Since plaintiff's wish to build two residences in the floodway neither affects a fundamental right nor implicates a suspect class, defendant contends the appropriate level of scrutiny against which section 18g is to be measured is the rational basis test. *Thompson*, 108 Ill. 2d at 368.

It is well settled that all laws regulating land use "must find their justification in some aspect of the police power, asserted for the public welfare." (*Village of Euclid v. Ambler Realty Co.* (1926), 272 U.S. 365, 387, 71 L. Ed. 303, 310, 47 S. Ct. 114, 118.) This court has stated that "the legislature has broad discretion to determine not only what the public interest and welfare require, but to. determine the measures needed to secure such interest." (*Thompson*, 108 Ill. 2d at 364.) "It is *** well established that reasonable restraints on the use of property in the interest of the common good and bearing a real and substantial relation to the public health,

safety, morals and general welfare constitute a valid exercise of the police power." (*Midland Electric*, 1 Ill. 2d at 208.)

> "It is clear that in the exercise of the police power, government may act to regulate, restrain or prohibit that which is harmful to the public welfare even though the regulation, restraint or prohibition might interfere with the liberty or property of an individual. [Citations.] There is a presumption in favor of the validity of any legislation, including of course a legislative act enacted under the police power. [Citations.] The burden of showing legislation to be an unreasonable exercise of the police power is on the party challenging it." (*Thompson*, 108 Ill. 2d at 368.)

> "The authority of the States to enact such laws as they deem reasonably necessary to promote the public health, morals, safety and general welfare comprehends a wide range of judgment and discretion in determining the matters which are of sufficiently general importance to be subjected to State regulation and administration. *** The police power, however, has constitutional limits, and any measure enacted or adopted in its exercise, to be sustained, must bear some reasonable relation to the purposes for which the power may be exercised." *City of Aurora v. Burns* (1925), 319 Ill. 84, 92-93.

*Thompson*, 108 Ill. 2d at 368.

Defendant identifies several legitimate State interests, any of which, it argues, provide a reasonable basis for the prohibition of new residential construction in the 100-year floodway. In addition to the interest of reducing flood damage, defendant argues that the prohibition protects the health and welfare of those who would live in the new houses, reduces the expenditure of public funds, and limits the extent of emergency relief services required by the periodic inundation of flood waters. Ill. Rev. Stat. 1989, ch. 19, par. 65g(d)(3).

Even if plaintiff were to successfully build the two proposed houses in the floodway at an elevation which

would not flood, defendant points out, the homes would still be surrounded by moving water during the 100-year floods. Emergency vehicles would not have access to the homes, and the residents could find themselves stranded without food, clean water, or electricity. In such a situation, defendant points out, the residents would very likely need to relocate temporarily to emergency shelters provided by the State's disaster relief services. Defendant argues that each and all of the above rationales justify the challenged flood control legislation and sustain its validity. Moreover, defendant argues that the report of the Governor's flood control task force supports a finding that a rational basis exists for the General Assembly's decision to prohibit new residential construction in the 100-year floodway.

We agree with defendant that the General Assembly has the authority to prohibit all new residential construction in the 100-year floodway. It is reasonable for the General Assembly to rely on the extensive research contained in the Governor's flood control task force report which documented the demographic and land use changes which have contributed to the increased flooding in the 100-year floodway. It is reasonable for the General Assembly to accept the recommendation of the task force that a central part in the response to the severe flooding which may occur in a 100-year flood event is the prohibition of all new residential construction in the floodway. It is also reasonable for the General Assembly to rely on the scientific study contained in the report which emphasized the importance of maintaining existing natural storage areas in the watershed to reduce flood damage.

We hold that the General Assembly has the authority, based on the police power, to prohibit the construction of new residences in areas which would be under water in the event of a 100-year flood event. For the reasons out-

lined above, such legislation is rationally related to several legitimate State interests. For the same reasons, we find section 18g bears a substantial relation to the public health, safety and welfare.

Plaintiff argues that defendant's approval of its construction permit in 1985 dictates that the prohibition contained in section 18g should not be applied to its properties. According to plaintiff, the prior approval indicates defendant impliedly and expressly found that plaintiff's proposed method of constructing the two residences would not have a detrimental effect on the property or surrounding area. Plaintiff characterizes this as unrebutted evidence that no adverse public health, safety or welfare consequences would stem from the proposed construction. Furthermore, plaintiff argues that defendant failed to produce any specific facts or engineering studies which would indicate that the public good would be enhanced by the defendant's denial of the permit extension. Plaintiff also argues that the Governor's flood control task force report does not support a different conclusion because the report does not specifically contain engineering studies directed at plaintiff's properties in the Butterfield Creek floodway.

We disagree that the original construction permit issued by defendant requires a finding that section 18g is unconstitutional as applied to plaintiff's properties. The permit as originally issued was in compliance with the rules in effect at that time. The permit expressly stated that if the work permitted was not completed before December 31, 1988, the permit would be void. When plaintiff applied for an extension of the permit, the rules prohibited all new residential construction in the 100-year floodway. Plaintiff misperceives the importance of the Governor's flood control task force report. Defendant argues that the report is evidence that the General Assembly determined it was necessary to modify its response

to the problem of flooding in the 100-year floodway: the General Assembly determined to supplant the old requirement that new construction must not increase the flood level with a new land use restriction to prohibit all new nonappropriate construction. This prohibition is a central part of the General Assembly's response to the flooding problem. The prohibition takes into consideration not only the concern about preventing further flooding, but also the concern about the need to provide disaster relief services and the need for the expenditure of State funds on shelters and rescue services for victims of flooding. Such concerns were not factored into defendant's prior decision, under the law before the General Assembly enacted section 18g, to issue plaintiff a construction permit.

Finally, plaintiff argues that defendant's refusal to grant the permit extension constitutes a taking of plaintiff's property without just compensation in violation of the fifth amendment to the United States Constitution. The fifth amendment provides in relevant part that "private property [shall not] be taken for public use, without just compensation." (U.S. Const., amend. V.) According to plaintiff, section 18g must be held unconstitutional as applied because application of section 18g to its properties deprives plaintiff of all economic use of the properties without due process.

As plaintiff acknowledges, the fifth amendment's prohibition of the taking of private property for public use without just compensation does not preclude the State from taking private property, but only requires the State pay compensation. (*Williamson County Regional Planning Comm'n v. Hamilton Bank* (1985), 473 U.S. 172, 87 L. Ed. 2d 126, 105 S. Ct. 3108.) The fifth amendment does not require that just compensation be paid in advance of, or even contemporaneously with, the taking. (*Hamilton Bank*, 473 U.S. at 194, 87 L. Ed. 2d at 143-

44, 105 S. Ct. at 3120.) "If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking." (*Hamilton Bank*, 473 U.S. at 194-95, 87 L. Ed. 2d at 144, 105 S. Ct. at 3121, quoting *Ruckelshaus v. Monsanto Co.* (1984), 467 U.S. 986, 1013, 1018 n.21, 81 L. Ed. 2d 815, 839, 842 n.21, 104 S. Ct. 2862, 2878, 2881 n.21.) Because the circuit court held section 18g unconstitutional as applied to plaintiff's properties, it did not reach this issue.

Defendant argues that plaintiff's taking challenge is premature, as plaintiff has not yet sought compensation pursuant to the Illinois Court of Claims Act (Ill. Rev. Stat. 1989, ch. 37, par. 439.8), relying on *Preseault v. Interstate Commerce Comm'n* (1990), 494 U.S. 1, 108 L. Ed. 2d 1, 110 S. Ct. 914. *Preseault* involved an action for administrative review of an Interstate Commerce Commission decision in which the plaintiffs alleged their property had been taken without just compensation. The Supreme Court determined that the plaintiffs' taking challenge was premature because of the failure to make use of the available Federal Court of Claims Act remedy.

Here, the State has not physically taken plaintiff's property. "Where no part of the land is taken, the property owner *** may find a remedy in the Court of Claims." (*Patzner v. Baise* (1990), 133 Ill. 2d 540, 546.) The Court of Claims Act provides, in pertinent part:

> "§8. The court shall have exclusive jurisdiction to hear and determine the following matters: (a) All claims against the state founded upon any law of the State of Illinois, or upon any regulation thereunder by an executive or administrative officer or agency ***." (Ill. Rev. Stat. 1989, ch. 37, par. 439.8(a).)

We agree with defendant that the Court of Claims Act provides a constitutionally adequate mechanism by which

plaintiff may obtain compensation should the facts reveal a taking of plaintiff's properties in the 100-year floodway. As defendant states, plaintiff has not been denied compensation; plaintiff has not sought compensation through the appropriate means.

Plaintiff argues that his taking challenge would be dismissed in the Court of Claims for failure to seek review under the Administrative Review Law, relying on *American National Bank & Trust Co. v. City of Chicago* (7th Cir. 1987), 826 F.2d 1547. According to plaintiff, since its taking challenge would be dismissed from the Court of Claims, it would have no remedy under the law unless this court finds section 18g unconstitutional as applied to its properties.

Plaintiff's reliance on *American National Bank* for authority that its taking challenge would be dismissed in the Court of Claims is misplaced. When the Administrative Review Law "is applicable and provides a remedy, the circuit courts may not redress the parties' grievances through other types of actions." (*Dubin v. Personnel Board* (1989), 128 Ill. 2d 490, 498.) An action for damages pursuant to the Court of Claims Act based on a taking of, or damage to, private property is not redressable pursuant to the Administrative Review Law. Ill. Rev. Stat. 1989, ch. 110, par. 3—111.

In *American National Bank*, the plaintiff, after having had its fifth amendment taking challenge dismissed in the State court for failure to properly serve summons on all defendants (see *American National Bank & Trust Co. v. City of Chicago* (1985), 132 Ill. App. 3d 570), sought to have its taking challenge heard in the Federal court. The Federal court dismissed the plaintiff's action, not for failure to seek administrative review in the State court, but for failure to have properly followed the State rules of procedure. *American National Bank* is not authority requiring plaintiff to pursue a remedy under the

Administrative Review Law which is unavailable, specifically, an action for damages. Since plaintiff's taking challenge is premature, we decline to address it.

For the foregoing reasons, the judgment of the circuit court is reversed.

*Reversed.*

JUSTICES BILANDIC and FREEMAN took no part in the consideration or decision of this case.