(No. 22827.)
BENJAMIN H. EHRLICH, Appellee, *vs.* THE VILLAGE OF WILMETTE, Appellant.

*Opinion filed June 14, 1935—Rehearing denied October 2, 1935.*

ZANE, MORSE, ZIMMERMAN & NORMAN, (JOHN M. ZANE, and EDWARD A. ZIMMERMAN, of counsel,) for appellant.

AARON H. COHN, for appellee.

Mr. JUSTICE SHAW delivered the opinion of the court:

The appellee, Benjamin H. Ehrlich, filed his bill for injunction to restrain the village of Wilmette and its officers from enforcing the provisions of a zoning ordinance restricting to residential use the area in which three lots owned by him are situated, and also seeking to enjoin the enforcement of certain provisions in a building code. Issues were formed by plea and answer and the cause was referred to a master in chancery, who heard the evidence and found that the material allegations of the bill had not been proved. He recommended to the chancellor that the bill be dismissed for want of equity. Appellee's objections to the master's report stood as exceptions before the chancellor and were sustained, the final decree finding that the zoning ordinance was arbitrary and unreasonable as it affected appellee's property and constituted a cloud on his title. A writ of injunction was ordered to issue perpetually enjoining appellant from enforcing the ordinance. The chancellor has certified that the validity of a municipal ordinance is involved, and an appeal has been prosecuted directly to this court.

The village of Wilmette is a residential suburb about fifteen miles north of Chicago. It is reached by a division of the Chicago and Northwestern railway, two interurban electric railways and the Chicago Rapid Transit Company's railway, which in Chicago is called the elevated railway and in that city runs on an elevated structure but at its terminal in Wilmette is on the surface of the ground. The village adopted a zoning ordinance, which contains general provisions classifying, regulating and restricting the

location of trades and industries, the location of buildings designed for specified uses, regulating and limiting the height and bulk of buildings, limiting the intensity of use of lot areas, providing for the areas of yards, courts and other open spaces within and surrounding buildings permitted to be constructed, and establishing boundaries of the districts for the purposes designated. The village is divided into "use districts," known as "A," residence district, "B," commercial district, and "C," industrial district. In "A" districts the only uses permitted are buildings for single-family dwellings, churches, temples, public schools, colleges, village hall, passenger station, farming, truck gardening, boarding and lodging houses, private clubs and educational institutions. In these districts residence buildings are required to be at least twenty-five feet from the fronting street, have a space of three feet on each side of the lot, and the rear yard must not be less than twenty per cent of the depth of the lot nor less than six inches in depth for each foot of height of the building. For the corner lots the provisions regarding front yards apply along the street on which the majority of the yards front and the other street is considered a side street. In commercial and industrial districts, buildings used exclusively for such purposes may occupy the entire area of the lot or lots. The same uses for "A" districts are permitted in "B" districts, and, in addition, apartment buildings and retail stores are permitted.

The ordinance restricts the area in which the lots of appellee are situated, being lots 1, 2 and 3 of the re-subdivision of lots 14 and 15, and lot 16 in block 20, to private residential use. Lots 1 and 2, and lots 9 to 16, both inclusive, in block 13; lots 14 to 21, both inclusive, in block 14; lots 6 to 13, both inclusive, in block 19, and lots 1 to 8, both inclusive, in block 20, are classified as commercial. Appellee's lots are near a retail business district but are about eight blocks east and somewhat south

of the main business portion of the village. The lots front on Fourth street, which extends north and south, and their entire frontage is 159.05 by 160 feet in depth. The following plat will be found helpful in considering the facts:

There was a small temporary building on the lots at one time but it has been removed. In block 20, in which appellee's lots are located, and west of those lots on the north side of Laurel avenue, are five single dwellings, all but one of which were built previous to 1922, when the zoning ordinance was passed. On the south side of Laurel avenue, in block 27, all the lots but one are improved with single-family residences. The one farthest east and immediately across the street from appellee's lots, facing on Fourth street, is a two-story frame house, subsequently stuccoed, and about fifty years old. To the immediate west and south, therefore, the territory is occupied by single-family residences. To the north the territory is devoted

to commercial use. Immediately across the alley to the north is a one-story brick building with a terra cotta front, facing Fourth street on the east and Linden avenue on the north. The building is occupied by persons and firms engaged in conducting stores and other business. The first is a studio for the sale of bric-a-brac and art novelties, and to the north are two vacant stores, (one temporarily used as a shelter by taxicab drivers,) and successively a kosher meat market, a real estate office, and a restaurant on the corner of Fourth street and Linden avenue. On the latter street to the west is a shoe repair shop, and west, respectively, a butcher shop, two grocery stores, formerly a tailor shop, meat market, hardware store and a tea room. A vacant lot adjoining an A. & P. store is next, and a vacant lot extends to the corner to the west. The principal building is heated by one heating plant. At the rear of the buildings is a court yard or driveway extending to the alley, for the use of trucks, and deliveries are made to and from the stores. There is also in the rear of the principal buildings to the west a garage and warehouse used in connection with a hardware store. It is immediately north of the west part or rear of appellee's lot 1 across the alley. On Fourth street north of Linden avenue are many places of business. On the northwest corner of Linden avenue and Fourth street is a brick building of stores two stories high for a distance of about thirty-five feet, and west on Linden avenue are one-story brick buildings for commercial purposes. East of Fourth street on Linden avenue for one hundred fifty feet are one-story buildings for stores. There is a concentration of traffic on Fourth street north of Laurel avenue. On the corner of Fifth street and Linden avenue is a three-story and basement apartment building of about fifty-six apartments and three stores on the Linden avenue side, east of which are numerous stores. There are also several stores north from Linden avenue on Fourth street. Northeast and northwest of the lots of

appellee the territory is devoted to retail business and apartments.

Fourth street in front of appellee's lots has a forty-one-foot paved roadway, but south of Laurel avenue the roadway is twenty-three feet in width. On the east side of Fourth street, directly opposite the lots of appellee, are a taxicab stand and the railway yards of the Chicago Rapid Transit Company. The terminal station of the railway is at the intersection of Fourth street and Linden avenue. Railway tracks extend somewhat diagonally northwesterly to the passenger station, and the yards to the south and east of the station are used for the storing and cleaning of cars. The northern part of the yards is used exclusively for the washing of cars. The trackage accommodates ten or twelve trains side by side and there is a loading platform parallel with the tracks. Trains are on the tracks most of the time. In the yards are a dispatcher's tower, sheds for storing oil, and a power-reduction building. Cars run on an average from three to seven minutes apart during the rush hours of travel. Because of the diagonal extension of the tracks there is additional space on the east of Fourth street north of Laurel avenue, and that is used by a taxicab stand. Adjacent to the space are signs, "Cab stand 20-car capacity," placed there by the police department of the village. This space is constantly occupied by taxicabs. An average of about two-thirds of the space is taken from noon until 1 :00 o'clock at night, or from ten to fourteen taxicabs between 12 :00 and 5 :00 o'clock. The business of the taxicab company is derived largely from passengers going to and from the terminal passenger station.

The evidence on behalf of appellee is that there is considerable noise from the use of horns, calling for drivers, and the movement of taxicabs. The taxicab space is separated from the street by a wall of concrete or stucco posts about eight feet in height, connected by wooden rails extending to a height of about four and a half feet. The

wall extends from the terminal station to Maple avenue. There is considerable switching of cars preparatory for the rush hours of travel. The Chicago North Shore and Milwaukee Railroad Company is in the vicinity of appellee's lots, extending northerly after crossing Laurel avenue, a little over a half block east of Fourth street. To obtain the right of way the motormen of that line, which is electrically operated, use the train whistles to signal the tower-man to throw the switch, and a signal bell announces the approach of the trains. Parking spaces on the west side of Fourth street directly in front of appellee's lots are marked with diagonal parking lines, and according to the testimony for appellee there is parking there most of the day. One of appellee's exhibits shows fourteen automobiles parked and occupying all the spaces marked in front of the lots. It was proved, and not disputed, that appellee acquired title to his lots by various transfers at a total cost to him of $21,000, or an average cost of approximately $116 per front foot. There was expert testimony to show that the value of the property if restricted as provided by the zoning ordinance would not exceed $50 a front foot, and further evidence tending to show that if used for commercial and apartment purposes it would be worth from $350 to $400 per front foot. There was some evidence that the lots were not suitable for single-family residences.

A great deal of evidence was taken, which is in some respects conflicting. It is, however, entirely sufficient to support the findings of the chancellor, which were in substance as follows: That because of the public character of Fourth street, the heavy traffic thereon, with attendant noise and dirt; the noise and disturbance from switching and shifting of cars in the yards of the Chicago Rapid Transit Railway Company immediately across the street from appellee's lots; the close proximity of the railway station, with attendant crowds and noise; the unfinished side walls of the buildings and of the rear yard of the store

building across the alley from appellee's lots, and the general character of the neighborhood and surroundings of the premises, appellee's lots are not suitable for use by the construction of single-family dwellings; that the territory about Fourth street and Linden avenue has been made a commercial district, and because of its location and proximity to a business district and transportation facilities the land of appellee is suited for a combination store and apartment building; that its value for such purpose is $350 to $450 a foot but for residential purposes it is not worth more than $50 per front foot; that the zoning ordinance is harsh, arbitrary and confiscatory and constitutes a cloud upon appellee's title and should be removed; that the inclusion of appellee's property in "A" residence district is not indispensable to a general zoning plan, and bears no substantial relation to the public health, safety, morals or general welfare of the village, and that its inclusion in the "B" commercial district would not tend to decrease the values of surrounding property.

The contentions of appellant's counsel are, that the bill of complaint, after its amendment, states no cause of action because appellee has an adequate remedy by *mandamus,* and that the decree is contrary to the evidence. Where the established distinctions between equity and common law jurisdiction are observed, injunction and *mandamus* are not correlative remedies in the sense of being applicable to the same subject matter, the choice of the writ to be resorted to in a particular case depending upon whether there is an excess of action to be restrained or a defect to be supplied. (*Fletcher* v. *Tuttle,* 151 Ill. 41, 59.) Injunction is a preventive remedy. The powers of courts of equity do not extend to determining what laws or ordinances are valid or invalid unless such determination is incidental to the protection of rights recognized by courts of equity alone. (*City of Chicago* v. *Chicago City Railway Co.* 222 Ill. 560, 570.) The restraining power of equity should be directed

against the enforcement, rather than the passage, of unauthorized ordinances. (*Roby* v. *City of Chicago,* 215 Ill. 604; *Stevens* v. *St. Mary's Training School,* 144 id. 336.) A court of equity will direct its restraining power against the enforcement of an ordinance, if ground exists therefor, to prevent irreparable injury. A zoning ordinance may be valid in its general aspects, and yet as to a particular state of facts involving a particular owner affected thereby be so clearly arbitrary and unreasonable as to confiscate his property and justify the interposition of a court of equity to restrain the enforcement of the ordinance. *Village of Euclid* v. *Ambler Realty Co.* 272 U. S. 365; *St. Andrew Society* v. *Kansas City,* 58 Fed. (2d) (U. S. Cir. Ct. of App. 593,) 599; *Nectow* v. *City of Cambridge,* 277 U. S. 183; *Kennedy* v. *City of Evanston,* 348 Ill. 426; *Phipps* v. *City of Chicago,* 339 id. 315; *Western Theological Seminary* v. *City of Evanston,* 325 id. 511.

It is argued by counsel for appellant that the last three cases are distinguishable from the present case in that the owners were using their property in reliance upon existing ordinances, but by amendments passed subsequent to the acquisition of the owners' rights their interests were so adversely affected by the amendments that injunction was the only proper remedy. In *Village of Euclid* v. *Ambler Realty Co. supra,* it was held that a suit to enjoin the enforcement of a zoning ordinance with respect to specific property need not be preceded by an application for relief under the ordinance from the board which administers it, where the gravamen of the bill is that the ordinance operates unconstitutionally to reduce the value of the land or destroy its marketability and the attack is not against specific provisions but is against the entire ordinance as it affects the particular property. In *St. Andrew Society* v. *Kansas City, supra,* it was held that there must be a limit as to what even a general plan may do, and the mere comprehensiveness of a zoning ordinance is in itself no justi-

fication for each separate restriction that the ordinance imposes, and an individual restriction must fail which exceeds the limits of the police power. Zoning ordinances are based upon the police power for the preservation of the safety, health, morals and general welfare of the people. *Kennedy* v. *City of Evanston, supra; Phipps* v. *City of Chicago, supra; People* v. *Village of Oak Park,* 331 Ill. 406.

Counsel for appellant concede that if the effect of the zoning ordinance here is confiscatory as to all property similarly situated, or if it is directed to a particular property, there is no need for an application to the village authorities, because they have acted and settled the question so far as the municipality is concerned. In the present case appellee's property is the only property in the block in which it is located fronting on Fourth street, which has been singled out for classification in the "A" resident district. No other property on Laurel avenue zoned for residences in the same block faces industrial property or adjoins commercial property. A passenger station is included in the classification "A" residence district, but the mere classification in a zoning ordinance cannot change the physical characteristics of the station or the railroad yards in that area. The lots of appellee front on a business street, and the diagonal marking of the spaces in front of the lots indicates that there is need for the conservation of space to permit the increased parking of automobiles. Across the street are a taxicab stand and the railroad station and yards. The only evidence of the value of the lots as residential or business and apartment property as to which actual figures were presented, was that as residential property the lots were worth $50 a front foot whereas as business and apartment property they would be worth from $350 to $400 a foot. In determining whether the invasion of property rights is unreasonable and confiscatory, the degree in which the values incident to the property are diminished by the restrictions of the ordinance must always be con-

sidered in connection with the facts in the particular case. (*State Bank and Trust Co.* v. *Village of Wilmette,* 358 Ill. 311; *People* v. *City of Rockford,* 354 id. 377; *Tews* v. *Woolhiser,* 352 id. 212; *Forbes* v. *Hubbard,* 348 id. 166; *People* v. *Village of Oak Park, supra.*) The bill originally presented the double purpose of seeking to enjoin the enforcement of the building ordinance and the zoning ordinance. When the references to the provisions of the building ordinance were eliminated from the bill it nevertheless continued to state a cause of action cognizable in a court of equity, for its purpose was to enjoin the enforcement as a present invasion of appellee's rights. (*State Bank and Trust Co.* v. *Village of Wilmette, supra.*) In *Forbes* v. *Hubbard, supra,* it was said: "As has been more than once announced by this and other courts, the judgment of the legislative department will not be disturbed merely because the court, if it were establishing zoning districts, would not have established them as was done by the city council or village board. The rule is, that where the question of reasonableness is fairly debatable, courts will not interfere with the legislative judgment, * * * but it has likewise been many times held that the governmental power to interfere by zoning regulations with the general rights of property owners by restricting the character of the use of their property is not unlimited, and such restrictions cannot be imposed if they do not bear substantial relation to the public health, safety, morals or general welfare. * * * · Individual rights in the ownership of property were not created by the constitution but existed before its adoption and are guaranteed by it. The declaration that private property shall not be taken for public use without just compensation or without due process of law is subordinated to the interest of the public welfare as expressed through the exercise of the police power of the State, but only where, and to the extent only that, such exercise of police power bears substantial relation to the promotion of

the public health, safety, morals or general welfare." In that case we further said: "It is clear from the undisputed evidence in this case that appellee's property is not characterized by the residence area lying west of it but rather by the business district which it faces." Here appellee's property is not characterized by the residence area lying west and south, but rather by the business district to the north and the commercial and industrial property across the street and by the use of the street as a business street.

The facts alleged and proved were within the equitable jurisdiction of the court and justified the decree of the superior court, and the decree is affirmed.

*Decree affirmed.*