(No. 33749.—

THE FIRST NATIONAL BANK OF LAKE FOREST, Trustee, Appellant, *vs.* THE COUNTY OF LAKE *et al.*, Appellees.

*Opinion filed November 23, 1955*

Overholser, Lewis and Flannery, of Libertyville, (Alfred W. Lewis, of counsel,) for appellant.

Latham Castle, Attorney General, of Springfield, and Robert C. Nelson, of Waukegan, (Walter W. Ulick, of counsel,) for appellees.

Mr. Justice Davis delivered the opinion of the court:

Plaintiff, The First National Bank of Lake Forest, Illinois, as Trustee under Trust No. 989, brought an action for a declaratory judgment in the circuit court of Lake

County against the county of Lake, its zoning board of appeals and the chairman and individual members of the board asking that the Lake County zoning ordinance adopted April 25, 1939, as amended June 9, 1952, be declared void insofar as the same classified three parcels of real estate belonging to plaintiff as R-4 residence property and that certain officers of the county be restrained from enforcing the ordinance as it applies to that property.

The complaint alleges that the present zoning classification does not permit the highest and best use of the tracts in question; that as to these properties the ordinance is confiscatory, unconstitutional, illegal, and void, and constitutes a violation of the fourteenth amendment to the constitution of the United States and section 2 of article II of the constitution of the State of Illinois. The complaint also alleges that the ordinance does not bear a substantial relation to the public health, safety, comfort, morals or general welfare and is therefore unreasonable and void. The defendants answered, admitting ownership of the property and its general description and location, as well as the fact that two of the properties may have greater value for proposed uses than they have for permitted uses, but denying that the highest and best use of the tracts is for the purposes sought, and substantially denying all of the other allegations of the complaint. After hearing the evidence for both sides, the court entered a declaratory judgment finding that the use of the properties other than for the permitted uses would increase the hazards of fire, thereby affecting the public safety; that the proposed uses would increase congestion in the public streets and highways and decrease taxable values of surrounding properties; that as to the properties in question the ordinance conserves taxable values and avoids congestion. The order declares that the ordinance as applied to the subject properties is fair and reasonable and is substantially related to the public health, safety, comfort, morals and general welfare

and therefore valid. The prayers of the complaint are denied. Plaintiff appeals directly to this court since the validity of a county zoning ordinance is involved and the trial court has certified that the public interest requires such an appeal.

The subject properties are located in an unincorporated area known as Venetian Village which is about twelve miles west of Waukegan on Grand Avenue, a two-lane concrete highway which has been designated as State Route 132. The community was formerly a resort neighborhood and consists of summer homes built near the many lakes which dot the territory. Two of these lakes, Sand and Miltimore, are in the immediate vicinity of Venetian Village and the properties in question. In recent years there has been extensive subdivision of farm lands, and more land is being subdivided at present with the result that there will be nearly 4000 residential lots in the village. The subdivisions have been improved with streets, storm sewers and electrical facilities. About 800 year-round homes have been built on the available lots since 1938 and the population is about 3000. Some of the subdivided lands lie north of Grand Avenue and some are located to the south, since the road nearly bisects the village, but most of the homes already constructed are to the south, in the vicinity south of Sand Lake and north and west of Miltimore Lake, both lakes being south of the highway. There are at present no industrial uses in the area and but few business uses. The latter consist of a combination tavern and grocery located on Sand Lake, a combination grocery and residence located on Granada Boulevard and a combination grocery and residence and a gas station located on Milwaukee Avenue, which is at the extreme west end of the village and about two miles west of the subject properties. The only lots zoned for business are 21 lots on Milwaukee Avenue. Most residents of the area do their shopping either at Lake Villa, which is two miles distant, Antioch or Grayslake which are

each seven miles distant or at Waukegan which is twelve miles to the east. With the exception of the lots zoned for business on Milwaukee Avenue, all property is now classified as R-4 residential. Under this designation the permitted use is for single family residences with certain restrictions as to lot size and area, depending upon water and sewer facilities. The R-4 classification also permits the uses designated in R-3, R-2, R-1A and R-1 districts. Included in R-1 uses are schools, with certain exceptions, publicly owned libraries, churches, publicly owned parks, playgrounds and forest preserves, and community service facilities including common water-supply plant, common sewage and waste-disposal plants, fire stations, police stations, social and recreational centers and hospitals, all upon special permit from the county board.

The beneficiaries of the trust of which plaintiff bank is trustee are individuals who have been engaged in the real-estate development business in Lake County since 1911 under the firm name of N. H. Engle and Sons. Morton Engle, who testified at the trial, is one of the principal beneficiaries. The principal occupation of the firm is purchasing and subdividing land. In 1938 they purchased 879 lots in Venetian Village south of Grand Avenue. In 1946 they purchased an additional 500 acres at the west end of Miltimore Lake and laid out 1475 lots. This property has been improved with streets, electric facilities and storm sewers. In 1953 the Engles acquired the Lehman estate properties which included a rectangular strip of land lying south of Grand Avenue and extending south to the north side of Sand Lake which is improved at its east end by a large 20-room residence. Also acquired were lands on the north side of the roadway which included a large amount of farm land improved with farm buildings. Engle testified that part of this land had already been subdivided into 828 lots and that an additional 190 acres was being subdivided which would produce another 700 lots. At the time the

Lehman estate property was purchased it had been zoned for farming and the purchasers entered into an agreement with the sellers that it would be zoned R-4 residential. It appears that the purchasers were parties to the re-zoning of the property and aided in securing the R-4 classification. Morton Engle testified that basically they are subdividers and the ideal arrangement is to purchase only vacant ground if you can but that the sellers of the Lehman properties were unwilling to sell the lands without the residence and farm buildings so they acquired it in its entirety as part of a "package deal." The properties in question here are part of the Lehman estate.

Parcel 1 is composed of 22 lots located on the north side of Grand Avenue between Lindenhurst Drive and Valley Drive, having a frontage of 1500 feet on the highway. These lots, with the exception of three or four at the east end of the tract, have a depth of 250 feet with a set-back line of 100 feet. Utility lines have been constructed on the rear of these lots. To the north and east of the parcel is an extensive tract of subdivided land on which 70 homes have already been built. Four homes have been built on the tier of lots just north of parcel 1 fronting on Old Elm Road, the next street north of Grand Avenue. The south line of the lots on which these homes have been built abut upon and so constitute the north line of corresponding lots in parcel 1. Lots in the area to the north and east of parcel 1 average 70 feet in width and 143 feet in depth and have been selling for $1200. The average value of homes in the subdivision is $7500 to $9000 plus ground. Plaintiff owns the property to the west and east of parcel 1 with the exception of one home. It also owns 150 to 200 lots to the northeast of parcel 1 and 190 acres in addition which is now being subdivided. Engle testified that he had been representing to prospective purchasers that, subject to their ability to have it rezoned, they contemplated building a shopping center on parcel 1.

Parcel 2 is located on the south side of Grand Avenue at the east end of the strip acquired from the Lehman estate. It consists of 2½ acres improved by a 20-room house surrounded by trees, lawns and formal gardens. The grounds extend from the paved road south to the north side of Sand Lake. The easterly boundary is Granada Boulevard, the northerly line is Grand Avenue, and to the west is a sizeable parcel of land owned by plaintiff and not subdivided. The testimony shows that since this large residence was acquired considerable effort has been made to sell or rent it for residence purposes to no avail. It costs about $6000 per year to maintain the house and grounds and the property is now vacant.

Parcel 3 is an irregular tract of about 13 acres located on the north side of the highway which is its southern boundary. On it are located seven buildings which were formerly the farm buildings of the Lehman estate. They include a large cow barn, silos, and other buildings used in connection with experimental farming and laboratory work. All the buildings are in good condition, have concrete floors and are served by an underground water system. Most of the buildings are one story in height, are either frame or stucco and have plastered walls. To the north, west and east of this 13-acre tract lie the former farm lands which have now been subdivided into lots for residence purposes. To the northwest is an additional 40 acres now being subdivided.

Prior to instituting the present proceeding for a declaratory judgment, plaintiff petitioned the Lake County zoning board of appeals to vary, amend, reclassify and rezone parcel 1 to B-1 business district classification, parcel 2 to the B-2 business classification and parcel 3 to the I-1 light industrial classification or in the alternative to the B-1 business classification. After a hearing the board recommended that the petition as to parcel 1 be denied; that the request as to parcel 2 be allowed and that the proposed rezoning

of parcel 3 be allowed in part to permit B-1 business district classification for the west half with variation for use of existing buildings thereon to be used only for woodworking or millwork shops, the balance to remain in the R-4 residential district. The county board referred the matter back to the zoning board of appeals for further consideration with the result that the zoning authorities resubmitted their original recommendation. The county board refused to follow the recommendation of the zoning board and denied the petition as to all properties.

Three witnesses testified for the plaintiff, including Morton Engle, one of the principal beneficiaries of the trust. All are men with extensive experience in selling and appraising real estate and the business of real-estate development generally. Their testimony, other than a description of each parcel and its surroundings, consists mainly of an expression of opinion as to the highest and best use for each tract and testimony as to value if devoted to proposed uses as compared with value for uses presently permitted. All agreed that the highest and best use for parcel 1 was for business, particularly a shopping center, which would include a super food market, drug store, hardware store, variety store, bakery and several smaller service stores. The opinion expressed was based largely upon the fact that there are presently no shopping facilities in the immediate vicinity and a supposed need for such facilities. All stated that the proposed use would benefit surrounding properties and have no detrimental effect on their value, and, since the depth of the lots was such as to permit ample parking areas, congestion on the highway would not be unduly increased. They were in agreement that the lots in parcel 1 are worth $1000 each for the use presently permitted but stated they should be worth $4000 to $6000 each if devoted to business. As to parcel 2 plaintiff's witnesses testified that its highest and best use was for business, such as a high-grade restaurant or rest home. This

opinion was based on the fact that there is no ready market for a 20-room property for residence purposes either for sale or rent and Engle's statement that he had prospects to sell it for a restaurant or convalescent home but had been unable to sell it or rent it for residence purposes. This property was valued by plaintiff's witnesses at from $15,000 to $20,000 for residence purposes and at $60,000 for business purposes. All stated that it would have no detrimental effect on surrounding properties if the proposed use was permitted. The plaintiff's witnesses testified that the highest and best use of parcel 3 was for light industrial purposes, based upon the availability and adaptability of the buildings located upon it for industry, the lack of industrial facilities in the community and Engle's statement that some of the persons who had bought lots and built homes there had expressed a desire for local employment; that others had declined to buy because there were no such facilities. All agreed that the proposed industrial use would not have a detrimental effect on surrounding properties or their values and that there would be no appreciable congestion of traffic. Plaintiff's witnesses valued parcel 3 at $10,000 for residence purposes and $40,000 to $50,000 for industrial purposes, due to the unsuitability of present buildings for residences and the high cost of removing them if the property were to be developed for residential use. One of plaintiff's witnesses testified that in considering a location for an industrial site some of the elements to consider are availability of labor, ingress and egress, availability of water and sewer facilities, types of buildings and presence of fire and police protection. Two of plaintiff's witnesses stated on cross-examination that their opinion that proposed uses would have no detrimental effect on surrounding properties assumed a good type of operation in a proper building.

Defendants called 14 witnesses including three experienced men in the real estate and appraisal field and a number of residents of the community. Defendants' experts

testified that the highest and best use of parcel 1 was for residence purposes and that it would have no greater value for business purposes than it has for permitted uses. They testified that business uses, if permitted, would have a detrimental effect on surrounding properties and their values and increase congestion since Grand Avenue is only a two-lane highway and not a suitable road for ingress and egress to and from a large shopping center. As to parcel 2, one of defendants' witness stated it was worth $35,000 as presently zoned and 25 per cent to 50 per cent less for business; that the building was not suitable for anything but a residence unless remodeled at considerable expense—probably $12,000. Another real-estate broker, testifying as to parcel 2, stated that as presently zoned it is worth $40,000 to $50,000 based on what he knows of the value of similar properties near the lake where there is water frontage. The same witness testified that the property would not be worth as much for business—$20,000 to $25,000 and possibly $35,000 to $40,000 if the building were particularly suitable for the intended business use. All of defendants' witnesses agreed that a business use on parcel 2 would depreciate the value of surrounding properties to the south and west around the lake, one estimating a depreciation of as much as 40 per cent. Defendant's witnesses did not consider parcel 3 as desirable industrial property because they felt that the buildings were not suitable and the site lacks transportation and sewage facilities. While two of them admitted that the buildings would have to be removed if the land were used as a residential development, all of the defendants' witnesses thought it had a greater value for residence than for industrial use, the value for the latter use being 25 per cent less according to two of the witnesses. In the opinion of defendants' witnesses the proposed industrial use would substantially affect the value of surrounding residential properties. One of them testified that there are some very nice homes located directly across the high-

way to the south whose lots extend down to the lake. He estimated that the value of these homes would be decreased by at least 50 per cent if an industrial use were permitted on parcel 3. It was also testified that the same effect would obtain as to the residence area located to the north for a distance of a block or two.

Eight residents and property owners testified in opposition to the proposed uses. Their properties are located in various parts of Venetian Village, some north and some south of the paved highway. All expressed the opinion that the proposed uses would depreciate the value of their properties. Without attempting to detail all of the testimony, it concerns, among other things, the lack of need for the proposed uses in the community. Several witnesses testified that they do their shopping in Lake Villa, two miles away and that the facilities there are adequate. It was also testified that the residents of Venetian Village work in such cities as Waukegan, Kenosha, North Chicago, Chicago, and Aurora; that they commute to their jobs and have chosen home locations in the village to avoid the congested conditions found in cities; that there is no need for industry in the particular locality. One witness who had purchased a lot in Unit 12 of the subdivision just north of parcel 1 testified that at the time he bought there were only five or six homes there, one a model home which was shown to him; that he had purchased in reliance that the subdivision was zoned R-4; that he resided in Chicago and chose the site for his home because he wanted to get away from the noise and congestion of business and industrial areas. Another witness who had bought from the trust a lot in the Lindenhurst Estates subdivision across the road from parcel 3 testified that his lot is 230 feet deep and extends from Grand Avenue south to Sand Lake; that he paid $6500 for the land alone and erected a substantial home on it; that his deed contained a covenant restricting the use of the land to residence purposes only; that if parcel 3 were

zoned for industry the value of his property would be substantially reduced. Another witness who had purchased a property on the north side of Grand Avenue adjoining parcel 3 on the west testified that at a zoning hearing on March 6, 1953, when it was being proposed to rezone the Lehman estate properties, Engle was present and was asked what kind of homes he intended to build; that he then stated he had built 500 homes in Venetian Village and would like to have the property zoned R-4 so he could erect one-family residences; that the property then being discussed included parcels 1, 2 and 3. On the matter of congestion, a deputy sheriff and an assistant county superintendent of highways testified as to the present volume of traffic on Route 132 and stated that the proposed uses would undoubtedly increase traffic congestion. It also appears from the testimony of defense witnesses that the nearest fire protection presently available is at Lake Villa 2 miles distant; that the equipment there consists of one truck and a jeep. There is no central public water supply or sanitary sewage system serving Venetian Village.

Before stating the principles of law to be applied to the facts presented, it should be emphasized that the proceeding in the trial court was not an action to review the decision of the county authorities in refusing to rezone the parcels for the proposed uses. While there was much testimony in the trial court as to proposed uses, most of that evidence, as the trial court observed, was beyond the scope of legitimate inquiry. In this proceeding the only issue tendered was whether the ordinance as applied to plaintiff's properties was arbitrary, unreasonable, capricious, confiscatory and without substantial relation to the public health, safety, comfort, morals and general welfare. In such a case the courts cannot act as a zoning body nor take any action to reclassify or rezone the property. Therefore the only question presented by this appeal is whether the decision of the trial court in sustaining the validity of the ordinance was proper.

Where the proper authorities adopt a zoning ordinance pursuant to a legislative grant, a presumption favoring its validity always obtains. (*Galt* v. *County of Cook*, 405 Ill. 396; *City of Springfield* v. *Vancil*, 398 Ill. 575; *Rothschild* v. *Hussey*, 364 Ill. 557.) One assailing the validity of such an ordinance as arbitrary and unreasonable as applied to particular property must prove by clear and affirmative evidence that the ordinance constitutes arbitrary, capricious and unreasonable municipal action, that there is no permissible interpretation which justified its adoption or that it will not promote the safety and general welfare of the public. (*People ex rel. Alco Deree Co.* v. *City of Chicago*, 2 Ill. 2d 350; *Mundelein Estates, Inc.* v. *Village of Mundelein*, 409 Ill. 291.) While cities and villages have statutory authority for the enactment of zoning ordinances, the power so conferred to interfere by zoning regulations with the general rights of property owners is not unlimited and such an ordinance, to be valid, must have a real and substantial relation to the public health, safety, morals or general welfare. (*Trust Co. of Chicago* v. *City of Chicago*, 408 Ill. 91; *People ex rel. Joseph Lumber Co.* v. *City of Chicago*, 402 Ill. 321.) Whether the restraints imposed by a zoning ordinance on the use of private property do in fact bear a real substantial relation to the public health, safety, comfort, or welfare, or whether they are essentially capricious and unreasonable is a question subject to judicial review. (*Quilici* v. *Village of Mt. Prospect*, 399 Ill. 418; *Offner Electronics, Inc.* v. *Gerhardt*, 398 Ill. 265.) In ascertaining this question each case must be determined on its own peculiar facts. (*Trust Co. of Chicago* v. *City of Chicago*, 408 Ill. 91; *Galt* v. *County of Cook*, 405 Ill. 396.) The privilege of a citizen to use his property according to his own will is both a liberty and a property right, subject however to the police power of the State under which new burdens may be imposed upon property and new restrictions placed upon its use when public welfare demands.

(*2700 Irving Park Bldg. Corp.* v. *City of Chicago,* 395 Ill. 138; *Bjork* v. *Safford,* 333 Ill. 355.) The constitutional declaration that private property shall not be taken for public use without just compensation or without due process of law is subordinated always to the interests of the public welfare as expressed through the exercise of the police power of the State. (*Ehrlich* v. *Village of Wilmette,* 361 Ill. 213; *Forbes* v. *Hubbard,* 348 Ill. 166.) It is the primary province of the municipal body to which the zoning function is committed to draw the line of demarcation as to the use and purpose to which property shall be assigned or placed, and it is neither the province nor the duty of the courts to interfere with the discretion with which such bodies are vested, unless the action of the municipality is shown to be arbitrary or capricious and unrelated to the legitimate objects above set forth. (*People ex rel. Joseph Lumber Co.* v. *City of Chicago,* 402 Ill. 321; *Morgan* v. *City of Chicago,* 370 Ill. 347.) Where there is room for a legitimate difference of opinion concerning the reasonableness of an ordinance governing the use of private property or where such question of reasonableness is fairly debatable, the courts will not interfere with the legislative judgment. (*Herzog Bldg. Corp.* v. *City of Des Plaines,* 3 Ill. 2d 206; *Trust Co. of Chicago* v. *City of Chicago,* 408 Ill. 91; *Ehrlich* v. *Village of Wilmette,* 361 Ill. 213; *Forbes* v. *Hubbard,* 348 Ill. 166.) Among the particular facts and circumstances to be taken into consideration in determining whether a purported exercise of the police power is so unreasonable and confiscatory as to constitute an unlawful invasion of private rights are the character of the neighborhood, the zoning classification and use of nearby properties, the extent to which property values are diminished by the particular zoning restrictions involved, and the gain to the public compared to the hardship imposed on the individual property owner. (*Trust Co. of Chicago* v. *City of Chicago,* 408 Ill. 91; *Galt v. County*

*of Cook,* 405 Ill. 396.) While the degree to which values are diminished by the restrictions of the ordinance must always be considered with the facts of the particular case in determining whether an alleged invasion of property rights by a zoning ordinance is unreasonable and confiscatory, the highest and best use of the property immediately involved is but one factor to be considered and the effect upon the value of other property must also be taken into account. (*People ex rel. Alco Deree Co.* v. *City of Chicago,* 2 Ill. 2d 350.) The fact that the property in question may be more valuable if zoned for other uses is not decisive, as this fact exists in nearly every case where the intensity with which property may be used is restrained by the zoning laws. *People ex rel. Alco Deree Co.* v. *City of Chicago,* 2 Ill. 2d 350; *Miller Brothers Lumber Co.* v. *City of Chicago,* 414 Ill. 162.

An analysis of the evidence offered on behalf of the plaintiff leads to the conclusion that its case is based primarily on a demonstration that the value of its properties would be enhanced if the proposed uses rather than those presently permitted were allowed; that as presently zoned its properties are not readily saleable and that if they were rezoned or the ordinance held unconstitutional they could be readily sold at a higher price. Were this fact conclusively established, that, alone, would not be enough to warrant a court in finding the ordinance unconstitutional under the authorities already cited. At best, the matter of lessened value brought about by application of the zoning restrictions is only one element to be considered. On this issue, however, the evidence for both sides is in sharp conflict. Witnesses for the defendants testified that the highest and best use for all three properties is for residential purposes and that their value for the proposed uses would be less than their value for uses presently permitted. There is no testimony in the record which would warrant the conclusion that any of the properties are totally unsuited

for the use for which they are zoned or that the ordinance as it applies to them is confiscatory. Viewing the evidence for both sides, the most that can be said is that the question of highest and best use for all of the properties is fairly debatable and does not sustain the allegation in plaintiff's complaint that the ordinance as applied to the properties is confiscatory. In this case the evidence clearly shows that the beneficiaries of the trust were interested in acquiring the Lehman estate farm for purposes of subdividing it into residential lots—a purpose for which it was for the most part suited. In order to acquire the lands suitable for their purpose they were compelled to enter into a "package deal" which included the large residence south of the highway and the farm buildings north of it. The plat introduced in evidence shows that all of the vacant lands thus purchased have already been subdivided into residential lots or are in process of subdivision. The purchasers agreed with the sellers on an R-4 classification for the entire property and aided in securing that result. They now seek to set it aside on three separate and relatively small parcels of land, as properties deserving of special consideration, including certain vacant lots, the large residence and the seven farm buildings. It cannot be doubted that parcels 2 and 3 involve the less desirable aspects of the deal or that the purchasers will suffer some hardships by the way of diminution of expected profits on the entire transaction if these properties are maintained in a residential classification, but these considerations alone will not warrant allowing them the relief they seek nor justify a conclusion that the ordinance is unconstitutional.

In determining the validity or invalidity of a given zoning classification, the question as to whether or not it is in conformity with surrounding existing uses and the zoning classification of nearby property is considered of paramount importance. (*La Salle National Bank* v. *City of Chicago*, 6 Ill. 2d 22; *Miller Brothers Lumber Co.* v. *City*

*of Chicago,* 414 Ill. 162.) The undisputed evidence in this case shows that the Venetian Village area is devoted almost entirely to residential uses and that it is zoned for residential purposes. The only businesses near the subject properties are a couple of nonconforming uses of long standing. The only lots zoned for business are the 21 lots on Milwaukee Avenue about two miles to the west of the parcels in question on which only two businesses have been established. The neighborhood is attractive as a residential area because of the many lakes and beautiful surroundings. Though it bears the name "Venetian Village" the territory is unincorporated and there are no central public water or sanitary sewage facilities. Nor is there any local police or fire protection. The entire village may be characterized as an attractive rural residential area. As presently constituted it is not equipped to cope with the problems engendered by the presence of industrial or extensive business uses.

Plaintiff contends that there is a need and a demand for the proposed uses and that their establishment would be of benefit to the surrounding residential properties. While Morton Engle, who testified for the plaintiff, stated that to be the fact, not a resident of the community took the stand to give the proposition his support or lend credence to the testimony of Engle. The evidence adduced by defendants is all to the contrary. The testimony shows that many of the residents do their shopping at Lake Villa only two miles away; that the facilities there are satisfactory and that they do not need or want a shopping center in Venetian Village. Even stronger is the evidence offered concerning the proposed industrial use. The residents of the area are employed elsewhere. They have deliberately chosen quiet homesites removed from their places of employment to avoid the noise and congestion attendant upon business and industrial pursuits. Not a resident testified that he would work in a factory if one were located on

parcel 3. From the pictures in evidence of the present buildings there is cause for doubt that many persons could be profitably employed there and doubt also as to their suitability for industrial uses. In any event their suitability for such purposes was denied by defendants' experts and, though plaintiff's witnesses stated they were suitable, their general character as farm buildings is apparent and that is the use for which they were constructed. These considerations, together with the testimony that the values of surrounding properties would be adversely affected and the further testimony that traffic congestion with its resultant hazards would be increased, all point to a reasonable and substantial relationship between the present residential classification and the legitimate objects of the exercise of the police power—*i.e.,* to further the public health, safety, comfort, morals and general welfare.

A recent decision of this court involved facts in many respects like those found in the present case except that the subject property, proposed to be used as a shopping center, was in that instance located in an incorporated city. Though it appeared that the property was suitable for commercial purposes and that such uses might be the highest and best to which it could be devoted, this court, observing that the property was in a predominantly residential area and that the proposed use would increase traffic hazards and congestion and depreciate the value of surrounding residential properties, held the residential classification of the zoning ordinance constitutional and reversed the judgment of the trial court holding it invalid. The opinion states that under such circumstances, where there is room for a fair difference of opinion concerning the reasonableness of the classification, the legislative judgment must be conclusive, and where the question whether property should be characterized as residential or commercial is fairly debatable, it is a question to be answered by the city council and not by this court. (*Herzog Bldg. Corp.* v. *City of Des Plaines,* 3 Ill.

2d 206.) What was said in the opinion in the *Herzog case* applies here with even greater force because of the conflict in the testimony as to the highest and best use and the suitability of the properties for proposed uses, particularly parcels *2* and *3*.

It is our conclusion that plaintiff has failed to show by clear and affirmative evidence that the zoning ordinance of Lake County, as applied to its properties, is arbitrary, unreasonable and confiscatory and bears no substantial or real relation to the public health, safety, comfort, morals or general welfare. The judgment of the circuit court of Lake County will therefore be affirmed.

*Judgment affirmed.*