(No. 34799.—

FIFTEEN FIFTY NORTH STATE BUILDING CORPORATION, Appellee, *vs.* THE CITY OF CHICAGO *et al.*—(COSMOPOLITAN NATIONAL BANK OF CHICAGO, Trustee, Appellant.)

*Opinion filed November 26, 1958—Rehearing denied Jan. 22, 1959.*

Davis, and Schaefer, JJ., dissenting.

L. Louis Karton, of Chicago, (Arthur Frankel, of counsel,) for appellant.

John C. Melaniphy, Corporation Counsel, of Chicago, (Sydney R. Drebin, of counsel,) for certain appellees, Kirkland, Fleming, Green, Martin & Ellis, of Chicago, (Howard Ellis, Vernon M. Welsh, and Frank L. Winter, of counsel,) for appellee Fifteen Fifty North State Building Corporation, and Vernon R. Loucks, of Chicago, (Charles O. Loucks and Clarkson W. Loucks, of counsel,) for appellee James L. Henry.

Mr. Justice House delivered the opinion of the court:

This case involves the validity of a 1956 amendment to the Chicago zoning ordinance which rezoned certain property now owned by Cosmopolitan National Bank, as trustee, from Volume 3 to Volume 4 residential usage. The action was commenced in the circuit court of Cook County by Fifteen Fifty North State Building Corporation on June 21, 1956, as a suit for injunction and declaratory judgment. The city of Chicago, George L. Ramsey, its building commissioner, Juliette Altman, the former owner of the rezoned property, and the Cosmopolitan National Bank were named as parties defendant. Juliette Altman was later dismissed from the proceedings and a neighboring property owner, James L. Henry, trustee, was permitted to intervene. The court found that the amendatory ordinance constituted an unreasonable exercise of the police powers, declared the ordinance void, and enjoined both the city and the bank from taking any action in reliance thereon. Direct appeal has now been prosecuted to this court.

The property in question is a rectangular tract located at the southeasterly corner of North Avenue and North Dearborn Parkway in the city of Chicago. It fronts upon

these streets for distances of 132 feet and 50 feet, respectively. North Avenue, an east-west street, lies one block north of Burton Place and serves as the southerly boundary of Lincoln Park from Clark Street easterly to the vicinity of Astor Street. North Dearborn Parkway is a north-south street lying one block east of Clark Street and one, two, and three blocks west of North State Parkway, Astor, and Lake Shore Drive, respectively. Adjoining defendant's tract on the east is a 16-foot alley which separates it from that owned by the original plaintiff. The latter tract is situated upon the southwest corner of North Avenue and North State Parkway, is known as 1550 North State Parkway, and consists of several lots having a total frontage on each parkway of 132 feet and 133½ feet respectively. Plaintiff's property is improved with a 12-story luxury apartment building which was originally constructed about 1912 with each floor of 20 rooms and 7 baths being occupied as a single apartment. In 1944, however, the building was remodeled by plaintiff so as to generally convert each floor into four smaller apartments with the result that the structure now houses 20 six-room, 10 five-room, and 10 four-room apartments. Immediately to the south of this building, at 1544 North State Parkway, is a three-story annex acquired by plaintiff about 1929 and used for servants' quarters and storage until it was converted into three separate apartments in 1955. Continuing south along the west side of North State Parkway there is located a 16-story apartment building owned by James Henry, the intervening plaintiff, at 1540 North State Parkway; a 17-story apartment house at 1530 North State Parkway; a smaller apartment building at 1516 North State Parkway; the Italian Consulate at 1512; another apartment house at 1508 North State; and a private residence upon the northwest corner of Burton and North State Parkway. At the southeast corner of North State Parkway and Burton there is presently a 28-story apartment building under construction,

and directly east across North State Parkway from plaintiff's property is the residence of the Catholic Bishop of Chicago.

Across North Avenue to tue north of the plaintiff's tract lie the wide expanses of Lincoln Park. Adjacent to the subject parcel on the south is an old residence which has been converted into nine one-room apartments and four more with a bedroom attached. Proceeding south along the east side of North Dearborn Parkway there is another converted apartment house, the Latin School, and then apartment buildings, rooming houses, and private residences down to Burton Place. On the west side of North Dearborn starting at Burton there is first a rooming house, then a hotel type apartment building, more apartment houses, a rooming house, and a private residence. At the southwest corner of North Dearborn Parkway and North Avenue there is the Eleanor Club, a residence for 123 single girls, which is just across Dearborn from the bank property. Proceeding westerly from the Eleanor Club along the south side of North Avenue there is first the Plaza Apartments, then the Plaza Hotel with its 443 apartments, and finally two other buildings running up to Clark Street.

The property in this general area was first zoned as a Volume 4 residential district in 1923, at which time the 12-story apartment building was located at 1550 North State and a private residence was situated upon that which is now the defendant bank's property. Some years later, in 1942, a comprehensive zoning ordinance was adopted by the city of Chicago under which all lots in this locality from the center of North State Parkway west past Clark Street were placed in a Volume 3 residential district, this being a more restrictive classification than the property had previously enjoyed. All the property from North State east to Lake Michigan retained its Volume 4 classification. The Fifteen Fifty Building premises exceeded a Volume 3 usage

and became a legal nonconforming use, since it was in existence upon that date.

The Cosmopolitan Bank trust beneficiaries became interested in the subject tract some time prior to January, 1956, at which time they engaged an architect to advise them as to its utility. Thereafter negotiations were had with Juliette Altmann for the purchase of the property and a purchase agreement subsequently executed. The purchase was made contingent, however, upon the property being rezoned to a Volume 4 classification. To this end a petition to rezone the property was filed with the appropriate municipal authorities and after a public hearing the Chicago city council on June 6, 1956, rezoned the parcel to a Volume 4 classification, the ordinance becoming effective on June 28, 1956. Meantime, on June 12, 1956, the Cosmopolitan Bank trust was created and the sales instruments escrowed with Chicago Title and Trust pending a final settlement. A deed for the property was executed and placed in escrow on June 18, 1956. Two days later the Cosmopolitan Bank entered into a $105,000 architectural contract for the construction of a 25-story apartment building on the premises. The building was to include two penthouses, 44 bedroom and 66 efficiency apartments. The present proceedings were commenced on June 21, 1956, and about July 8, 1956, the Altman sale was consummated with the purchase price of $87,500 being then paid to the vendor. Thereafter, the defendant bank proceeded with the building plans, expending $100 for an alley bond, $500 for a street bond, $1,700 for wrecking the old residence then on the premises, $2,400 for a city sprinkler permit, and $400 to $500 for various soil tests. Upon the bank's application, a building permit for the new apartment house was issued on February 27, 1957, but before any substantial construction work was commenced, the permit was revoked by letter of May 20, 1957. The only reason assigned therefor was the pendency

of the present action. About this same time a new comprehensive zoning ordinance was approved by the municipal authorities, to become effective July 8, 1957. Under this ordinance all property in the general area between Dearborn and Astor was placed in an R-7 residential district. The lots lying east of Astor to Lake Michigan received an R-8 classification, the least restrictive residential area. On June 5, 1957, hearings were commenced in these proceedings.

At the trial George F. Nixon, president and controlling shareholder of the plaintiff corporation, spoke of conditions as they existed in 1944 when he remodeled the 12-story apartment building. According to his testimony the area was then devoted solely to apartment and residential use. The west side of State between North and Burton was all single family residences except for 1530 North State Parkway upon which was located a 16-story apartment building, and on the east side of Dearborn in this same block all were private residences except for the Latin School. Between 1944 and June, 1956, he observed that a 16-story apartment building was erected at 1540 North State Parkway, the Eleanor Club was constructed, and several residences in the block were converted to apartments. He further pointed out that his building has accommodations for only 12 automobiles, that most of his tenants are wealthy people, that he was satisfied with his nonconforming use status and did not want a Volume 4 classification. He stated that he was afraid some of his tenants would move if the proposed building were constructed.

Four expert witnesses testified upon behalf of the plaintiff. Their consensus was that the proposed structure would depreciate the Fifteen Fifty Building Corporation property from $50,000 to $100,000 by reason of increased traffic and parking problems, obstruction of light and air to plaintiff's building, greater noise, incompatibility of the proposed structure, and the character of tenants who occupy efficiency apartments. They did admit, however, that recent changes

had been made in the locality, including the construction of the Eleanor Club, the new multi-story apartment houses at 1540 and 1530 North State Parkway and the conversion of older residences into apartments and rooming houses. They were also agreed that even under a Volume 3 classification the proposed structure could have been built to a height of 12 stories.

Milton Schwartz, the architect employed by the defendant bank, described in some detail the plans for the proposed apartment building. It would be 25 stories tall, contain both apartments with separate bedrooms and the so-called "efficiency apartments" with folding beds, accommodate 54 automobiles in its basement garage, and have horizontal ground measurements of 38 by 98 feet. He explained that all apartments would face Lincoln Park, that the proposed building could be constructed only in a Volume 4 residential zone, and that the R-7 classification awarded by the 1957 zoning ordinance would not allow such improvement.

Harry F. Chaddick, director of rezoning for the city of Chicago and for Cook County, testified upon behalf of the defendants that his staff processed the application to rezone the subject property from Volume 3 to Volume 4 and recommended its approval to the city council. This was done, he said, because it would be uneconomical to build such a structure under a Volume 3 classification, because of adjacent Volume 4 property, and because it fronted upon Lincoln Park. He went on to explain that all the lots east of State were zoned Volume 4, that the Fifteen Fifty Corporation premises, although being a legal nonconforming use, were being utilized as Volume 4 property, and that therefore the rezoning of the subject parcel was merely an extension of this district along the open area of Lincoln Park. He further stated the whole philosophy of zoning was to place the greatest density of population adjacent to parks, lakes, and other open spaces, and that

the Fifteen Fifty Building Corporation property would also have been given a Volume 4 classification had they requested it.

Three experts testified for the defense. They agreed that the highest and best use of the subject property was for the proposed 25-story structure and that such improvement would not adversely affect the surrounding property, but would rather aid in building the area up from its current declining economic status. In their opinion the new apartment building would not materially affect the traffic and congestion already caused by the proximity of Dearborn Street and Lincoln Park nor cause any material curtailment of light, air and privacy to the plaintiff's land. The majority of properties in the area were judged to be at least 40 years old and, because of the adjoining Lincoln Park, it was thought that the maximum residential density should extend all the way from Lake Shore Drive to Dearborn and not stop at either Astor or State.

Before considering the validity of the 1956 ordinance we must first determine what effect, if any, the 1957 ordinance has upon the use of the subject property, for should it be applicable and controlling, any dispute in regard to prior classifications would be rendered moot. The general rule in Illinois concerning the retroactive effect of zoning ordinances is stated in *Deer Park Civic Ass'n* v. *City of Chicago*, 347 Ill. App. 346, (petition for leave to appeal denied, 412 Ill. 629,) where the court held that any substantial change of position, expenditures, or incurrence of obligations occurring under a building permit or in reliance upon the probability of its issuance is sufficient to create a right in the permittee and entitles him to complete the construction and use the premises for the purposes originally authorized irrespective of a subsequent zoning or change in zoning classification. Such holding is in accordance with the majority views expressed in other jurisdiction. (*Pelham View Apartments* v. *Switzer*, (1927) 130

*Misc.* 545, 224 N.Y.S. 56; *Wasilewski* v. *Biedrzycki,* (1923) 180 Wis. 633, 192 N.W. 989; *Rosenberg* v. *Village of Whitefish Bay,* (1929) 199 Wis. 214, 225 N.W. 838; 138 A.L.R. 501.) Here, the purchase of the property was made contingent upon the Volume 4 rezoning, payment of consideration therefor in the amount of $87,500 was held in abeyance until the amendatory ordinance became effective; a $105,000 architectural contract was executed preparatory to actual construction; sums in excess of $3,400 were spent for bonds, permits, and soil tests; and the former residence upon the tract was razed at a cost of $1,700. Although some of these obligations were incurred prior to the date the building permit was issued, all were made subsequent to the June 6, 1956, amendatory ordinance and in reliance either upon a legal building permit or upon the probability of its issuance. The fact that the permit was later revoked is not material since no valid reason was assigned for this action. We therefore hold that by virtue of the change in defendant bank's position as above specified, the bank acquired a right under the 1956 ordinance, and if it be valid, the owner may proceed in reliance thereon unaffected by the ordinance adopted in 1957.

It is, of course, elementary that a presumption exists in favor of the validity of a zoning ordinance and one assailing it must prove by clear and affirmative evidence that the ordinance is arbitrary, capricious, and bears no relationship to the health, safety, and welfare of the general public. (*First National Bank of Lake Forest* v. *County of Lake,* 7 Ill.2d 213; *Galt* v. *County of Cook,* 405 Ill. 396; *Zadworny* v. *City of Chicago,* 380 Ill. 470.) Where there is room for legitimate difference of opinion concerning this fact or such is fairly debatable, the courts will not interfere with the legislative judgment. (*La Salle Nat. Bank* v. *County of Cook,* 12 Ill.2d 40; *Wesemann* v. *Village of La Grange Park,* 407 Ill. 81; *Kinney* v. *City of Joliet,* 411 Ill. 289.) Although plaintiff strongly asserts that the pro-

posed structure would greatly increase the traffic problem, obstruct its light and air, and cause an influx of less desirable inhabitants, such is not supported by the record. It is admitted that even under a Volume 3 classification defendant bank could construct the proposed building to approximately the same height as the Fifteen Fifty structure. This being the case, plaintiff would suffer a maximum amount of visual obstruction under a Volume 3 use. It is difficult to see how the presence of a taller building under Volume 4 would materially aggravate the situation. Furthermore, it must be remembered that where the bank structure would be only 40 feet wide, the plaintiff's building extends 90 feet back from North Avenue. Thus at no time could more than a fraction of the latter structure be so affected.

As to the traffic problem, it is true that Dearborn is one of the main north-south arteries to the city loop, and Lincoln Park is a constant attraction to the motoring public; yet it does not follow that one more apartment building will have any substantial adverse effect upon this situation. The proposed building will have at least 54 off-street parking spaces as compared with the plaintiff's twelve. Such being the case, we are not impressed with this contention nor with the suggestion that efficiency apartment tenants "can't compare" with the plaintiff's wealthy clientele. In the present case, the principal objectors to the proposed structure are themselves owners of multi-story apartment buildings. While it may well be that such an improvement will increase the tempo of economic competition and cause an influx of a different social strata, this in itself cannot be held an undesirable result.

In their briefs to this court, plaintiffs strongly urge that the 1956 amendatory ordinance constitutes spot zoning and must therefore be condemned. While it is true that inconsistent zoning of small parcels is not to be encouraged, this does not mean that every reclassification of a single tract is void *ipso facto;* rather, it must be determined

whether such change is in harmony with a comprehensive plan for orderly utilization of property in the locality; and the size of the rezoned tract or area is merely one factor to be considered. (*Trust Co. of Chicago* v. *City of Chicago,* 408 Ill. 91; *Town of Marblehead* v. *Rosenthal,* (1944) 316 Mass. 124, 55 N.E.2d 13; *Fitchett Crescent Corp.* v. *City of New York,* (Sup. Ct. 1956) 155 N.Y.S.2d 272; *Cassel* v. *Mayor and City Council of Baltimore,* (1949) 195 Md. 348, 73 A.2d 486; *Partain* v. *City of Brooklyn,* (Ohio Com. Pleas, 1955) 138 N.E.2d 180.) The fact that such a reclassification may be detrimental to certain individuals is not controlling if it has been accomplished in the interests of the public as a whole. (*Trust Co. of Chicago* v. *City of Chicago,* 408 Ill. 91; *Levinsky* v. *Zoning Commission,* (1956) 144 Conn. 117, 127 A.2d 822.) At the time the 1956 ordinance was adopted, Volume 4 residential construction was permitted adjacent to Lake Michigan and along the southerly boundary of Lincoln Park to the center of North State Parkway. The defendant's property faced upon Lincoln Park and was separated from the least restrictive residential district by only the premises at 1550 North State, which was itself a Volume 4 nonconforming use. As was pointed out by Harry Chaddick, Chicago and Cook County director of zoning, such reclassification was approved under a comprehensive plan to place the greatest density of population along open areas, such as lakes and parks, and served merely to extend the Volume 4 district westerly along Lincoln Park and to put defendant's property upon an equal basis with other lots having a similar frontage.

It is evident that we are here concerned not with spot zoning but with a reclassification based upon changing conditions between 1942 and 1956, during which time the character of this vicinity was materially altered. Many of the finer residences were converted into apartments; roominghouses began to appear; a 16-story apartment building was constructed by James Henry, the intervening plaintiff; the

residence immediately south of the subject property was changed into one-room apartments; and the Eleanor Club was erected. That such a trend was recognized by the plaintiff corporation is reflected in the fact that it converted its luxurious suites into smaller, more economical apartments in 1944 and changed the servants' quarters into additional apartments in 1955. Upon these facts we hold that plaintiffs have failed to show by clear and affirmative evidence that the 1956 amendatory ordinance bore no relationship to the health, safety, and welfare of the general public. Thus, the lower court erred in declaring it invalid.

For the reasons stated, the decree of the circuit court of Cook County is reversed.

*Decree reversed.*

Mr. JUSTICE DAVIS, dissenting:

I believe that the amendatory ordinance of June 6, 1956, is a form of spot zoning and ought to be struck down. The court agrees that spot zoning is not to be encouraged, but suggests that the important issue is "whether such change is in harmony with a comprehensive plan for orderly utilization of property in the locality." The evidence indicates that the June 6 ordinance does not meet this test; it singles out for special consideration a tract of land, 50 by 132 feet, located in an area which has been progressively zoned for more restricted use. I am unable to determine, either by the record or conjecture, how this amendment can be justified as an exercise of legislative power for the benefit of the public.

In 1942 the city council, by a comprehensive ordinance, determined that the use of this tract, as now proposed by defendant, ought not be permitted. In 1957, the city council, after 15 years of further study, again passed a comprehensive zoning ordinance which does not permit the proposed structure. Compared to this studied exercise of the zoning power for the public welfare, the ordinance of June 6, 1956, stands out as a legislative aberration. It is com-

mon practice for zoning ordinances to limit the intensity with which land may be used, (Ill. Rev. Stat. 1957, chap. 24, par. 73—1; *Honeck* v. *County of Cook,* 12 Ill.2d 257; *First National Bank* v. *County of Lake,* 7 Ill.2d 213,) to to the end that health, safety, and the general welfare may be promoted. We have sustained such an ordinance with reference to the height of a hotel building. (*Chicago City Bank & Trust Co.* v. *City of Highland Park,* 9 Ill.2d 364.) The United States Circuit Court of Appeals has enforced the provisions of such an ordinance by mandatory injunction even though the cost of restoring the building to compliance approximated $350,000. (*Welton* v. *40 East Oak Street Building Corporation,* (7th Cir.), 70 Fed.2d 377; also see *Welton* v. *Hamilton,* 344 Ill. 82.) There is ample authority for striking the ordinance of June 6, 1956.

The power to amend a zoning ordinance is not unfettered, and can be exercised only when in the interest of public health, safety, comfort or welfare. The evidence must show that the amendment was passed for the public good and the power of amendment should not be exercised merely because certain individuals want it done. (*Trust Co. of Chicago* v. *City of Chicago,* 408 Ill. 91; *Dunlap* v. *City of Woodstock,* 405 Ill. 410; *Offner Electronics, Inc.* v. *Gerhardt,* 398 Ill. 265; *Kennedy* v. *City of Evanston,* 348 Ill. 426.) Neither the facts stated in the opinion of the court, nor in the record, bring the ordinance within the ambit of this test. The amendatory ordinance of June 6 is a deviation from the comprehensive zoning plans approved both before and after its adoption. The comprehensive ordinances and the ordinance here characterized as one providing for spot zoning, cannot both be based on the public welfare, and I conclude that it is the June 6 ordinance which is deficient in this respect.

Although I base my dissent on the invalidity of the June 6 ordinance, I also agree with the trial court that this property is now in an R-7 use district under the 1957 ordi-

nance, and that such ordinance is now controlling. While the First District Appellate Court has held that under certain circumstances, a party can, in good faith, so change his position in reliance on a valid ordinance as to make it inequitable to enforce a subsequent change in zoning, the authorities differ on the degree of action that must be taken in order that the permit privilege ripen into a vested right. (See *Deer Park Civic Ass'n* v. *City of Chicago,* 347 Ill. App. 346.) In the case at bar, the "spot zoning" ordinance was adopted by the city council on June 6, 1956, the instruments to be executed in connection with the sale were placed in escrow on June 12, and the sale was made contingent upon the rezoning of the property. The deed was signed and placed in escrow June 18, and on June 20, the trustee entered into a $105,000 architectural contract for the 25-story apartment building. The proceedings in question were filed June 21, and the ordinance became effective June 28. The sale was consummated July 8 and thereafter the trustee expended approximately $5,000 in connection with the project. Before any substantial work was done the permit was revoked. Thus, all expenditures were made either before June 28, 1956, the effective date of the amendatory ordinance, or after the pendency of this action. Under such circumstances, this is a case of precipitous haste and needless action prior to the effective date of the "spot zoning" ordinance and, in part, with knowledge of the pending suit. Such action does not amount to a good faith change in position which would entitle the defendant to rely on the June 6 ordinance, even if valid, and make the action of the city in enforcing the 1957 comprehensive zoning ordinance inequitable when applied to appellant's property.

I would affirm the decree of the trial court.

Mr. JUSTICE SCHAEFER joins in this dissent.